# In the United States Court of Federal Claims

No. 09-454 C
(Filed Under Seal: November 30, 2010)
(Reissued: December 15, 2010)[*]

| | | |
|---|---|---|
| ************************************ | | Post-Award Bid Protest; Army and Air |
| JOYCE TERRY, | * | Force Exchange Service; Non-Appropriated |
| d/b/a SHIRT SHACK, | * | Fund Instrumentalities; 28 U.S.C. § 1491(a); |
| | * | Implied-in-Fact Contract Jurisdiction; |
| Plaintiff, | * | 28 U.S.C. § 1491(b); "Federal agency"; 28 |
| | * | U.S.C. § 451; Jurisdiction; RCFC 12(b)(1); |
| | * | Perkins; Administrative Procedure Act, |
| v. | * | 5 U.S.C. §§ 701-706; Scanwell; W.B. |
| | * | Fishburn Cleaners, Inc.; Ellsworth Bottling; |
| | * | Co.; MCI Telecommunications Corp.; |
| THE UNITED STATES, | * | Administrative Dispute Resolution Act |
| | * | of 1996; Contract Disputes Act of 1978, |
| Defendant. | * | 41 U.S.C. §§ 601-613; Submission |
| | * | of a "Claim" to the Contracting Officer; |
| ************************************ | | Failure to Allege Bias/Bad Faith |

Bonnie Michelle Smith, Warner Robins, GA, for plaintiff.

Arlene Pianco Groner, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

        Before the court in this post-award bid protest is defendant's motion to dismiss.  Plaintiff Joyce Terry, doing business as Shirt Shack, alleges that the Army and Air Force Exchange Service ("AAFES") unlawfully awarded a concession contract at Fort Benning in Columbus, Georgia to a concessionaire that purportedly did not satisfy certain requirements set forth in the solicitation.  Plaintiff also brings a claim under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601-613 (2006), alleging that the AAFES violated the law with respect to another concessionaire contract she was performing as a kiosk operator at Fort Benning.  Defendant moves to dismiss plaintiff's bid protest claim for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") because, it contends, the United States has not waived its sovereign immunity with respect to bid protest claims against a non-appropriated fund instrumentality ("NAFI") such as the AAFES.  Additionally, defendant

---

        [*] On December 14, 2010, the parties filed a joint status report indicating that no redactions were necessary.

moves to dismiss plaintiff's CDA claim for lack of jurisdiction pursuant to RCFC 12(b)(1) or, in the alternative, for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6).  The court, for the reasons set forth below, finds that it possesses jurisdiction over plaintiff's bid protest claim, but not her CDA claim.[1]

## I.  BACKGROUND[2]

### A.  The Solicitation

On October 6, 2008, the AAFES issued a solicitation for proposals related to the operation of a T-shirt concession at Fort Benning commencing March 22, 2009, for a period of no greater than five years.  Am. Compl. ¶ 5; AR 33-95.  Gross monthly sales from the concession operation were estimated at $45,000 per month.  AR 37.  Offerors were advised to contact the contracting officer, Kay K. Dunbar, with any questions about the solicitation.  Id. at 18, 35.  The solicitation provided that the contracting officer was the only individual authorized to "waive or change contract terms[ and] impose additional contract requirements . . . ."  Id. at 40.

Plaintiff maintains that offerors were required to own certain garment ink printing equipment in order to participate in the solicitation.  Exhibit G of the solicitation, titled "Concessionaire Furnished Equipment," enumerated the type and quantity of equipment that the concessionaire was required to furnish at two concessionaire locations.  Id. at 73.  The equipment required at the main exchange building included a heat transfer press and a transfer machine, which were required to "be new or in 'like new' condition . . . ."  Id.  The heat transfer press had to be "[c]apable of transferring rubber based and sublistatic ink transfers.  Insta Model 515 or equivalent."  Id.  The transfer machine had to be "[c]apable of transferring decals to caps/hats. Insta Model 412 or equivalent."  Id.  The solicitation also required that "[h]eat pressed items . . . be offered on a while-you-wait-basis."  Id. at 75.  All equipment furnished by the concessionaire was subject to the following terms: (1) title to the equipment remained with the concessionaire; (2) concessionaires were permitted to lease equipment so long as they provided the contracting officer with the name and address of the lessor; (3) a concessionaire's investment in any equipment constituted a business risk that the concessionaire alone assumed; and (4) neither the AAFES nor any other agency or instrumentality of the United States was liable to the concessionaire for the cost of the concessionaire's investment in equipment in the event that the contract was terminated without extension.  Id. at 55.

---

[1]  Because the court finds that it lacks jurisdiction over plaintiff's CDA claim, it does not reach defendant's RCFC 12(b)(6) motion.

[2]  The facts are derived from the amended complaint ("Am. Compl."), exhibits accompanying the amended complaint ("Am. Compl. Ex."), and the administrative record ("AR").

Plaintiff began selling T-shirts with her husband in 2000 and worked as an AAFES concessionaire for over fourteen years. Id. at 198. At the time she participated in the instant procurement, plaintiff operated a separate T-shirt kiosk at Fort Benning at which she sold the T-shirts on-post that her husband printed off-post. Id.; Am. Compl. ¶¶ 33-35. To participate in this procurement, plaintiff "purchased a machine known as a Garment Printer which [would] let [her] do all [her] shirts at the point of sale, as well as do a customer['s] custom design requests on the spot." AR 198. She therefore believed that she possessed "all the necessary equipment[,] such as [a] Garment Printer, heat press, cap press, and mug press," that were purportedly required in order to participate in the procurement. Id.

## B. The Procurement Process

The AAFES received proposals from plaintiff on October 29, 2008, id. at 123; cf. id. at 180, 189-90 (indicating that plaintiff signed her proposal on October 28, 2008), T-Shirt House, the incumbent concessionaire, on November 5, 2008, id. at 156, and a third company, L & W Creations, on November 6, 2008, id. at 123-24; cf. id. at 201, 206-07 (indicating that L & W Creations signed its proposal on November 5, 2008). As part of her proposal, plaintiff listed a fee to the AAFES of thirty percent, which was based upon total adjusted gross sales, for a contract period of five years. Am. Compl. Ex. 1. By comparison, T-Shirt House proposed a thirty-one percent fee and L & W Creations proposed a twenty-four percent fee. AR 124. Thereafter, the AAFES requested final statements and other documentation from L & W Creations, which ultimately never responded to the requests. Id. Consequently, L & W Creations "was found non-responsive." Id.

On November 20, 2008, Ms. Dunbar requested a "best and final offer" from plaintiff and T-Shirt House, the two remaining offerors. Id. at 124, 138. Ms. Dunbar apprised plaintiff of various discrepancies in her proposal, and plaintiff, in response, submitted a modified proposal on November 21, 2008. Id. at 137. In her modified proposal, plaintiff increased her fee to the AAFES from thirty percent to thirty-seven percent. Am. Compl. ¶ 12; Am. Compl. Ex. 2. T-Shirt House modified its proposal on November 22, 2008, increasing its proposed fee to 33.1 percent. AR 124, 172.

Ms. Dunbar determined that the best and final offers submitted by plaintiff and T-Shirt House contained fees that were "too high compared to the Region and Conus fee averages," which were 18.14 percent and 20.06 percent, respectively. Id. at 124. Indeed, the record reflects Ms. Dunbar's assessment that, if either bid was accepted, each offeror would be "operating in the red." Id. at 156. On December 2, 2008, Ms. Dunbar sent electronic-mail communications to both plaintiff and T-Shirt House requesting (1) financial information, (2) submission of a Monthly Projected Operating Statement ("MPOS"), and (3) reexamination of the costs each offeror would incur in providing the services (or similar services) encompassed by the solicitation. Id. at 124. Plaintiff received a letter from Ms. Dunbar requesting that she "re-examine the costs [she] may incur in providing this service" and submit an MPOS because Ms. Dunbar believed that her proposal might "be too high to operate at a profit." Id. at 135. Ms.

Dunbar also informed plaintiff that she "may either confirm or amend [her] proposal," but a "[f]ailure to provide the information by the date/time specified . . . may result in [her] original proposal being considered for award."  Id.

On December 9, 2008, plaintiff, who alleges that furnishing another revised proposal violated the terms of the solicitation, Am. Compl. ¶ 13, submitted an MPOS, which indicated a net profit of $1,536 per month, AR 125, 130.  She also reduced her fee to the AAFES from thirty-seven percent to twenty-seven percent.  Id. at 125.  On December 11, 2008, T-Shirt House submitted its MPOS, which indicated a net profit of $2,587.50 per month, and revised its fee to the AAFES from 33.1 percent to 27.5 percent.  Id. at 168-69; cf. id. at 163 (containing a December 15, 2008 electronic-mail communication from T-Shirt House submitting a revised fee to the AAFES of 27.25 percent).  Also on December 9, 2008, Ms. Dunbar contacted Victoria A. Roldan, the services business manager at Fort Benning, to confirm the accuracy of the $45,000 monthly gross sales estimate contained in the solicitation.  Id. at 149-50.  Ms. Dunbar apprised Ms. Roldan that offerors questioned the estimate, and "[i]f the sales were over inflated . . . , then it will make it very difficult for the offeror[s] to give a reasonable fee percentage."  Id. at 150. Ms. Roldan confirmed that the sales estimate was not overinflated.  Id. at 149.

Thereafter, the AAFES deemed the revised proposals submitted by plaintiff and T-Shirt House to be both fair and reasonable.  Id. at 125.  T-Shirt House remained the highest fee offeror, and its 27.25 percent fee to the AAFES was 2.25 percentage points higher than its then-current contract with the AAFES and 0.25 percentage points higher than the fee contained in plaintiff's proposal.  Id. at 156.  On December 18, 2008, the AAFES awarded the contract to T-Shirt House because it provided the AAFES with the "best advantage in accordance with the competitive evaluation criteria set forth in the solicitation."  Id. at 179, 213-14.

### C.  Plaintiff's Protest

Plaintiff contends that her company was the only offeror that owned an Anajet Garment Printer, a heat transfer press and transfer machine that she asserts was required equipment under the solicitation.  Am. Compl. ¶¶ 12, 14-15.  According to plaintiff, Ms. Roldan informed her that she was required to own the heat transfer press and transfer machine in order to have her bid considered.  Id. ¶ 18.  Plaintiff, in reliance upon Ms. Roldan's oral statements, purchased the equipment, which cost in excess of $10,000.  Id. ¶ 19.  On December 22, 2008, plaintiff protested the AAFES award of the concessionaire contract to T-Shirt House.  Id. ¶ 16; AR 355, 359. According to plaintiff,

> [t]he contract stated you MUST have the equipment to make a t-shirt on the premises.  The T-Shirt House doesn't have the equipment on the premises and has not for the last five years . . . .  [H]ow did they answer the question about the equipment?  I HAVE THE EQUIPMENT.  My bid was the highest until you asked me to change my bid.  I feel like this was fixed from the beginning for the T-SHIRT HOUSE to be awarded the Contract.

4

AR 359.  Additionally, plaintiff alleged bias in the procurement process:

> The statement [related to owning an Anajet Garment Printer] was made by the person who has the sunglass stand at Fort Benning that VICK[Y] [Roldan] would take care of Jill [Pellegrini] at the T-Shirt House[,] and Angela and Jill at the sunglass stand [s]ocialize with VICK[Y] after hours.  Isn't this a conflict of interest?  You need to check into all of this.

Id.

In a written response dated December 30, 2008, Ms. Dunbar denied plaintiff's protest.  Id. at 355-56.  First, Ms. Dunbar indicated that all proposals were properly considered in accordance with applicable procurement procedures and solicitation criteria, explaining that the contract award to T-Shirt House "was based on the highest fee offered to [the] AAFES."[3]  Id. at 355. Second, Ms. Dunbar responded to plaintiff's claim concerning the on-site location of the equipment at issue by indicating that the solicitation "does not require the contractor to have the equipment on the premises as stated in your letter."  Id.  Third, Ms. Dunbar refuted plaintiff's contention that she was required to modify her proposal:

> I did not ask you to change your bid; I requested a best and final fee offer [from] all of the offerors.  In return[,] two offerors came back with what appeared to be unreasonably high fees, so I requested that each offeror fill out a[n MPOS] in order to see if the contractor could operate at such a high fee.  The offerors came back with a reasonable fee percentage based on the MPOS and the contract was awarded to the highest fee offeror.

Id.  Finally, Ms. Dunbar rejected plaintiff's allegations of bias:

> While either or both of [your] allegations may or may not be true, neither could or did impact the award decision.  Ms. Roldan had no influence over or input into the decision to award the contract; all such decisions are made by contracting officers at HQ AAFES [in Dallas, Texas] based upon the proposals submitted by the offerors.

Id.

---

[3]  Ms. Dunbar explained that T-Shirt House "was determined eligible; [had] adequate financial resources . . . ; was able to comply with the required performance; has a record of satisfactory performance . . . [and] integrity; has the necessary organization, experience, and technical skills . . . ; and has the necessary technical equipment and facilities to perform the contract . . . ."  AR 356.

### D.  Procedural History

Approximately seven months after Ms. Dunbar denied her protest, plaintiff filed a complaint in the United States Court of Federal Claims ("Court of Federal Claims").  Plaintiff requests, among other things, that the court set aside the contract award to T-Shirt House, require the AAFES to reevaluate her proposal, and direct the AAFES to award her the contract.  Am. Compl. Wherefore ¶¶ 1-2.  Following briefing, the court heard argument on defendant's motion to dismiss and plaintiff's motion to supplement the administrative record.  At the court's request, the parties submitted supplemental briefs concerning the effect, if any, of Resource Conservation Group, LLC v. United States, 597 F.3d 1238 (Fed. Cir. 2010), upon these proceedings.  With briefing concluded, the court is prepared to rule.

## II.  LEGAL STANDARDS

### A.  Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); see also Matthews v. United States, 72 Fed. Cl. 274, 278 (2006) (stating that subject matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case").  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion."  Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999).  When considering an RCFC 12(b)(1) motion, the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it.  See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936).  The plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The court must accept as true the allegations in the plaintiff's complaint and must construe such facts in the light most favorable to the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982); Reynolds, 846 F.2d at 747.  If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction.  See McNutt, 298 U.S. at 189.  When ruling upon a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes.  See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747.  If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim.  Matthews, 72 Fed. Cl. at 278; see also RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or

otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

The ability of the Court of Federal Claims to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941).  A waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  Three distinct waivers are at issue in this case.

## 1.  Implied Contract Jurisdiction

First, the Tucker Act waives sovereign immunity for claims founded upon either "express or implied" contracts with the United States.  28 U.S.C. § 1491(a)(1) (2006).  With regard to implied contracts, a distinction must be made between an implied contractual relationship in law or in fact.  The Tucker Act "does not reach claims based on contracts implied in law . . . ."[4] United States v. Mitchell, 463 U.S. 206, 218 (1983); see also Merritt v. United States, 267 U.S. 338, 341 (1925) ("The Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law.").  Thus, the Tucker Act only extends to an implied-in-fact contract, which constitutes "an agreement . . . founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."  Balt. & Ohio R.R. Co., 261 U.S. at 597.  The Court of Federal Claims possesses jurisdiction over implied-in-fact contracts with the AAFES.  28 U.S.C. § 1491(a)(1); S. Foods, Inc. v. United States, 76 Fed. Cl. 769, 774 & n.7 (2007).

## 2.  Bid Protests

Second, the Tucker Act waives sovereign immunity for claims against the United States in bid protests.  The Court of Federal Claims possesses "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2).  Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to

---

⁴  An agreement implied in law "is a 'fiction of law' where 'a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress.'"  Hercules Inc. v. United States, 516 U.S. 417, 424 (1996) (quoting Balt. & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923)); see also Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007) (explaining that an implied-in-law contract is one "in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice").

award the contract." Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (Supp. IV 1998)).

The Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874-76, expanded the bid protest jurisdiction of the Court of Federal Claims to include post-award bid protests. Pursuant to the ADRA, the Court of Federal Claims reviews the legality of an agency's decision in accordance with the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2006). 28 U.S.C. § 1491(b)(4). Although the APA contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). While "it is well-settled that procurement officials are entitled to broad discretion in the . . . application of procurement regulations," Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 622 (2002), the court may set aside a procuring agency's contract "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure," Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The protester must show, by a preponderance of the evidence, that either ground justifies a set-aside of the contract award. AmerisourceBergen Drug Corp. v. United States, 60 Fed. Cl. 30, 35 (2004); see also Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) (articulating the preponderance of the evidence standard).

### 3. CDA Claims

Third, the CDA is a statute that waives sovereign immunity. Winter v. FloorPro, Inc., 570 F.3d 1367, 1370 (Fed. Cir. 2009). Plaintiff's amended complaint implicates 28 U.S.C. § 1491(a)(2), which permits the Court of Federal Claims to exercise jurisdiction over CDA claims.[5] "Under the CDA, this Court's jurisdiction is predicated upon a contractor meeting two fundamental requirements: (1) the submission of a written claim to the contracting officer and (2) the agency's issuance of a final decision." OK's Cascade Co. v. United States, 87 Fed. Cl. 739, 745 (2009); see also James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996) ("[F]or the court to have jurisdiction under the CDA, there must be both a valid claim . . . and a contracting officer's final decision on that claim."). The CDA provides that, if a contractor has a dispute with the government "relating to a contract," then the contractor shall submit a written claim to the contracting officer within six years after the accrual of the claim. 41 U.S.C. § 605(a) (2006). Thereafter, the contracting officer must issue a decision "within a reasonable time," after having considered factors such as the "size and complexity of the claim"

---

[5] Although the complaint implicates 28 U.S.C. § 1491(a)(2), plaintiff only asserts jurisdiction under sections 1491(a)(1), 1491(b)(1), and the CDA. Am. Compl. ¶ 4.

and the "adequacy of the information in support of the claim."[6]  Id. § 605(c)(3); see also L & D Servs., Inc. v. United States, 34 Fed. Cl. 673, 677 (1996) ("Section 605(c) establishes maximum periods within which a contracting officer must issue a decision on a claim–either within 60 days or within a reasonable time."). The contracting officer's decision must be in writing, "shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this chapter." 41 U.S.C. § 605(a); accord 48 C.F.R. § 33.211 (2009). A contracting officer's failure to issue a decision "within the period required" is deemed to be a decision denying the claim. 41 U.S.C. § 605(c)(5). The decision of the contracting officer is final unless the contractor makes an authorized appeal. Id. § 605(b). A contractor may appeal a contracting officer's decision to the Court of Federal Claims. Id. § 609(a)(1); see also Sharman Co. v. United States, 2 F.3d 1564, 1568 (Fed. Cir. 1993) ("Under the CDA, a final decision by the contracting officer on a claim, whether asserted by the contractor or the government, is a 'jurisdictional prerequisite' to further legal action thereon."), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1572 (Fed. Cir. 1995) (en banc).

## B. The NAFI Doctrine

The court's jurisdiction is limited by the NAFI doctrine. See Furash & Co. v. United States, 252 F.3d 1336, 1339 (Fed. Cir. 2001); L'Enfant Plaza Props., Inc. v. United States, 668 F.2d 1211, 1212 (Ct. Cl. 1982). A NAFI "is an entity which does not receive its funds from congressional appropriations."[7] AINS, Inc., 56 Fed. Cl. at 524; see also AINS, Inc., 365 F.3d at 1337 ("The sine qua non of all NAFIs is apparent in their name: they do not receive appropriated funds."). In Standard Oil Co. of California v. Johnson, the United States Supreme Court ("Supreme Court") acknowledged the existence of federal entities for which the government did not accept financial responsibility. 316 U.S. 481, 485 (1942). The Supreme Court's observation in Standard Oil Co. of California became "the basis of a series of decisions by the [United States] Court of Claims [("Court of Claims")] to the effect that it lacked jurisdiction over claims concerning the activities of nonappropriated fund instrumentalities." United States v. Hopkins, 427 U.S. 123, 125 (1976). The United States Court of Appeals for the Federal Circuit ("Federal Circuit") explained:

The Court of Claims opined that its jurisdiction under the Tucker Act was limited to claims against the general fund, or more specifically, to claims against government instrumentalities whose judgments could be paid from appropriated funds. The Court of Claims reasoned that when the government assumed no liability for a federal entity, the government could not be said to have consented to

---

[6] Because plaintiff seeks nonmonetary relief, the sixty-day time period for the contracting officer's decision specified in 41 U.S.C. § 605(c)(1)-(2) with respect to monetary claims is inapplicable.

[7] For a brief history of the origin of NAFIs, see AINS, Inc. v. United States, 56 Fed. Cl. 522, 527-28 (2003), aff'd, 365 F.3d 1333 (Fed. Cir. 2004).

suit against that entity–and that the Tucker Act consequently provided the Claims
Court with no jurisdiction to hear complaints against these entities. NAFIs
therefore retain their sovereign immunity from suit for breaches of contract that
Congress waived with respect to government agencies funded by appropriations
from the general fund.

AINS, Inc., 365 F.3d at 1337.

Judgments awarded by the court against the government must be paid out of appropriated
funds. 28 U.S.C. § 2517; see also L'Enfant Plaza Props., Inc., 668 F.2d at 1212 ("The
jurisdictional grant under the Tucker Act is limited by the fact that judgments awarded by this
court are to be paid out of appropriated monies."). Jurisdiction "can only be exercised . . . over
cases in which appropriated funds can be obligated." L'Enfant Plaza Props., Inc., 668 F.2d at
1212. Therefore, "absent some specific jurisdictional provision to the contrary[,] the Court of
Federal Claims lacks jurisdiction over actions in which appropriated funds cannot be used to pay
any resulting judgment." Furash & Co., 252 F.3d at 1339; accord El-Sheikh v. United States,
177 F.3d 1321, 1324 (Fed. Cir. 1999) ("The general rule is that the Court of Federal Claims lacks
jurisdiction to grant judgment against the United States on a claim against a NAFI because the
United States has not assumed the financial obligations of those entities by appropriating funds to
them."). This exception to the Tucker Act has become known as the NAFI doctrine, and it
developed based upon the "premise that the government has never waived its sovereign
immunity to allow private parties to bring breach of contract claims against NAFIs."[8] AINS,
Inc., 365 F.3d at 1336. As the court in Fusaro v. United States noted, the "limitations of the
NAFI doctrine apply to contract claims against NAFIs, not other claims that are based on Acts of
Congress, like the [Fair Labor Standards Act], or the Constitution, like takings claims. Congress
intended to limit Tucker Act jurisdiction with respect to NAFIs only within the contracts
context." 84 Fed. Cl. 712, 715 (2008) (citation omitted).

The determination of whether a particular entity is a NAFI has evolved into a four-factor
test. Citing prior case law, the Federal Circuit, in AINS, Inc., explained that a government
instrumentality is a NAFI under the following circumstances. First, the instrumentality must
"'not receive its monies by congressional appropriation.'" Id. at 1342 (quoting Hopkins, 421
U.S. at 125). Second, the instrumentality must "derive[] its funding 'primarily from [its] own
activities, services, and product sales.'" Id. (quoting Cosme Nieves v. Deshler, 786 F.2d 445,
446 (1st Cir. 1986)) (alteration in original). Third, absent a statutory amendment, there is no
situation in which appropriated funds could be used to fund the federal entity. Id. (citing United

---

[8] The NAFI doctrine does not insulate the United States from constitutional claims
because the federal government "incurs takings liability for the acts of its agents." Lion Raisins,
Inc. v. United States, 416 F.3d 1356, 1362-63 (Fed. Cir. 2005). Thus, where NAFIs "are agents
of the United States," the Court of Federal Claims possesses jurisdiction over takings claims
against the government based upon the actions of NAFIs. Id. at 1363 (citing Standard Oil Co. of
Cal., 316 U.S. at 485).

States v. Gen. Elec. Corp., 727 F.2d 1567, 1570 (Fed. Cir. 1984) ("[T]he non-appropriated funds exclusion is limited to instances when, by law, appropriated funds not only are not used to fund the agency, but could not be.")).  Finally, there must be "'a clear expression by Congress that the agency was to be separated from general federal revenues.'"  Id. (quoting L'Enfant Plaza Props., Inc., 668 F.2d at 1212).  Under this test, the AAFES is a NAFI.[9]  Hopkins, 427 U.S. at 127; Taylor v. United States, 303 F.3d 1357, 1361 (Fed. Cir. 2002); see also 10 U.S.C. § 4779(b) (2006) ("No money appropriated for the support of the Army may be spent for . . . Army exchanges."); id. § 9779(b) ("No money appropriated for the support of the Air Force may be spent for . . . Air Force exchanges.").

Plaintiff filed her bid protest claim pursuant to 28 U.S.C. § 1491(b).  The court addresses the intersection of its jurisdiction over NAFIs, its bid protest jurisdiction under section 1491(b), and its implied-in-fact contract jurisdiction, as it relates to procurement protests under section 1491(a), below.

### III.  PLAINTIFF'S BID PROTEST CLAIM

Plaintiff contends that the AAFES acted arbitrarily and capriciously by awarding T-Shirt House the concessionaire contract despite its alleged failure to own "the required top grade

---

[9]  The AAFES, "a unique and impressive operation" that "resembles a private enterprise," Champaign-Urbana News Agency, Inc. v. J.L. Cummins News Co., 632 F.2d 680, 683 (7th Cir. 1980), is an "entity comprising the activities, personnel, property and nonappropriated funds through which exchange and motion picture services are provided to the Army and Air Force." MCI Telecomms. Corp. v. Army & Air Force Exch. Serv., Civ. A. No. 95-0607RMU, 1995 WL 317435, at *6 (D.C. Cir. May 9, 1995) (unpublished decision); see also Hammock v. United States, 324 F.3d 1155, 1156 (10th Cir. 2003) (stating that the AAFES "provides retail services to military personnel around the world").  A modern day post exchange, Ellsworth Bottling Co. v. United States, 408 F. Supp. 280, 282 (W.D. Okla. 1975), the AAFES "is part of the Departments of the Army and the Air Force, and hence, a part of the Department of Defense."  MCI Telecomms. Corp., 1995 WL 317435, at *6 & n.9; accord Castillo v. Army & Air Force Exch. Serv., 849 F.2d 199, 200 (5th Cir. 1988) (per curiam) ("The AAFES is a non-appropriated government agency within the Department of Defense.").  One court elaborated:

> The AAFES is a joint major command of the U.S. Army and the U.S. Air Force under the jurisdiction of the Chief of Staff, U.S. Army and Chief of Staff, U.S. Air Force. . . .  The Secretary of Defense has vested in the Secretary of the Army and the Secretary of the Air Force all functions, powers and duties relating to exchange service activities within their respective departments.  Thus, it is clear that the AAFES is a part of the Departments of Army and Air Force and, hence part of the Department of Defense.

Ellsworth Bottling Co., 408 F. Supp. at 284.

'Cadillac' T-Shirt equipment as required in the solicitation . . . ." Pl.'s Mot. Supplement Administrative R., Mot. Perm. Inj. Relief & Mot. J. Administrative R. After Supplemented ("Pl.'s Mots.") 4. According to plaintiff, she was the only qualified offeror and would have received the contract award but for the AAFES's alleged procurement errors and Ms. Roldan's acts of bad faith. Id.; see also Am. Compl. ¶¶ 21-22 (alleging that Ms. Roldan "wrongfully influenced" the procurement process and that her "methods for procurement were arbitrary and capricious"), 27 (alleging that the AAFES engaged in a "wrongful bidding and award process). Additionally, plaintiff alleges that the AAFES discriminates against small businesses, women, and minorities in the administration of her concessionaire contract at Fort Benning. Am. Compl. ¶¶ 33-38 (alleging that the AAFES requires plaintiff to pay a fee percentage to the AAFES that is higher than the percentage paid to the AAFES by other concessionaires).

Defendant argues that the court lacks jurisdiction over plaintiff's bid protest claim because the AAFES is a NAFI and NAFIs are not encompassed by the term "Federal agency" contained in 28 U.S.C. § 1491(b). Def.'s Mot. Dismiss & Opp'n Pl.'s Mot. Supplement Administrative R. ("Def.'s Mot.") 1, 11. Plaintiff contends that defendant's interpretation of the ADRA is "rigid" and is, among other things, "contrary to justice . . . ." Resp. Def.'s Mot. Dismiss ("Pl.'s Opp'n") 4.

As previously stated, the Tucker Act confers upon the Court of Federal Claims jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals . . . ." 28 U.S.C. § 1491(b)(1). Whether the court possesses jurisdiction over a protest involving a AAFES procurement under section 1491(b) appears to be an issue of first impression. Defendant frames the jurisdictional issue as follows: the AAFES is not as "Federal agency" within the meaning of the Tucker Act, Def.'s Mot. 6, the AAFES is a NAFI, and the ADRA "does not include NAFIs within its jurisdictional grant," Def.'s Mot. 11. Plaintiff, however, asserts that section 1491(b) jurisdiction is "broad and includes many NAFI solicitation bid protests." Pl.'s Opp'n 2.

**A.   Jurisdiction Over NAFI Procurements Pursuant to 28 U.S.C. § 1491(b)**

Contrary to plaintiff's assertion in her opposition to defendant's motion to dismiss, the requirement that jurisdiction be established as a threshold matter "is 'inflexible and without exception.'" Steel Co., 523 U.S. at 94-95 (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)). As previously noted, plaintiff cannot rely solely upon allegations in the complaint when jurisdiction is challenged; rather, she must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189. Plaintiff has not done so in this case. Instead, plaintiff invokes Southern Foods, Inc. for the proposition that the Court of Federal Claims has "found jurisdiction over a bid protest action protesting the award of a NAFI contract . . . ." Pl.'s Opp'n 2. Plaintiff is mistaken. Although the Southern Foods, Inc. court addressed the NAFI doctrine, it concluded that the procuring agency in that case was not a NAFI. See 76 Fed. Cl. at 775-76 (explaining that an entity must meet all four factors set forth by the AINS, Inc. court in order to be deemed a NAFI and concluding that the procuring agency, which

was explicitly authorized to receive appropriated funds, failed to satisfy one of the <u>AINS, Inc.</u> NAFI factors).  Therefore, <u>Southern Foods, Inc.</u> is inapposite.[10]  Plaintiff also asserts that <u>Lion Raisins, Inc.</u>, wherein the Federal Circuit held that the Tucker Act permits suits against a NAFI for an alleged Fifth Amendment taking, supports her jurisdictional argument because "[t]he splitting of hairs between procurement and takings is just plain wrong."  Pl.'s Opp'n 3.  Once again, plaintiff is mistaken.  In <u>Lion Raisins, Inc.</u>, the Federal Circuit encountered a takings claim, not a bid protest claim.  As such, plaintiff's reliance thereon is misplaced.

Defendant, relying upon <u>Taylor</u>, suggests that the ADRA is more akin to 5 U.S.C. § 5597, the military separation pay statute at issue in that case.  In <u>Taylor</u>, the Federal Circuit, which affirmed the dismissal of separation pay claims of AAFES retirees for lack of jurisdiction, rejected the argument that section 5597 applied to NAFI employees.  303 F.3d at 1358, 1362.  Section 5597 imposes upon the Secretary of Defense the obligation to "establish a program under which separation pay may be offered to encourage eligible employees to separate from service voluntarily (whether by retirement or resignation)," 5 U.S.C. § 5597(b), but the Federal Circuit determined that the statute "imposes on AAFES at most an unfunded obligation insufficient to waive sovereign immunity from breach of that obligation" to issue separation pay, 303 F.3d at 1361.  Whereas the Fair Labor Standards Act ("FLSA") extended "expressly to NAFI employees," the Federal Circuit concluded that section 5597 "does not authorize appropriated funds for NAFI separation pay."  <u>Id.</u>  Consequently, it held that the Court of Federal Claims lacked jurisdiction over the appellant-retirees' claims.  Defendant contends that <u>Taylor</u> compels a similar finding in the bid protest context.[11]

Additionally, defendant cites <u>Made in the USA Foundation v. United States</u>, 51 Fed. Cl. 252 (2001), to support its contention that the court lacks jurisdiction over plaintiff's bid protest.  <u>Made in the USA Foundation</u>, however, involved a CDA claim.  Although defendant is correct that the court determined that it lacked jurisdiction, the ruling turned on the plaintiffs' failure to submit a "claim" under the CDA.  <u>Id.</u> at 254-55, 257.  Explaining that the "record with respect to plaintiffs' breach of contract claim is not sufficiently developed to enable the Court to determine whether plaintiffs have a legitimate entitlement for money presently due," <u>id.</u> at 256, the court rejected the plaintiffs' argument that it could entertain their claims for declaratory relief pursuant

---

[10]  The <u>Southern Foods, Inc.</u> court determined that the procuring agency was not a NAFI.  Yet, it suggested that the NAFI doctrine "would have no application to plaintiff's argument for injunctive and declaratory relief under the court's ADRA bid protest jurisdiction, as such relief would not involve the payment of monies from the Treasury."  76 Fed. Cl. at 775.  Defendant "disagree[s]" with this observation, which it characterizes as dictum.  Def.'s Mot. 13.

[11]  Defendant also argues that <u>Fusaro</u>, a case in which the Court of Federal Claims determined that it possessed jurisdiction over NAFI employees' claims brought under the FLSA and the Back Pay Act, is inapposite in the bid protest context because the Federal Circuit previously held that the FLSA, the statute at issue in <u>Fusaro</u>, expressly applied to NAFIs.  Def.'s Mot. 12-13.

to 28 U.S.C. § 1491(a)(3), id. at 256 n.5.  Section 1491(a)(3), the court noted, was repealed in 1996 and replaced by section 1491(b), and the court determined that section 1491(b) had no application in a CDA claim context.  Id.  Although it cited a Government Accountability Office ("GAO") holding that "NAFI's are not federal agencies for bid protest purposes," the court explained:  "[N]othing in plaintiff's complaint suggests that the dispute . . . should be characterized as a bid protest."  Id.

Ultimately, these cases do not address the central issue in this case, viz., whether an AAFES procurement is encompassed within the court's section 1491(b) bid protest jurisdiction.

### 1.  The Language of Section 1491(b)

"When interpreting a statute, the Court must begin with the language of the statute itself." Hopi Tribe v. United States, 55 Fed. Cl. 81, 87 (2002) (citing Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)).  Section 1491(b) provides that the Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency . . . ."  28 U.S.C. § 1491(b)(1) (emphasis added). The Tucker Act "is explicit that the entity that issues the solicitation must be a federal agency." Blue Water Envtl., Inc. v. United States, 60 Fed. Cl. 48, 51 (2004).  Therefore, the court must address whether the AAFES constitutes a "Federal agency" within the meaning of the Tucker Act.

The ADRA incorporated the term "Federal agency" into 28 U.S.C. § 1491(b)(1) but did not define it.  Nevertheless, the term "agency," for purposes of title 28 of the United States Code, "includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense."[12]  28 U.S.C. § 451.  The Federal Circuit explained that "[section] 451 dictates that an 'agency' for purposes of Title 28 must be within the domain of the United States. Accordingly, 'federal agency' as used in 28 U.S.C. § 1491(b)(1) falls within the ambit of 'agency' as used in 28 U.S.C. § 451."  Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1080 (Fed. Cir. 2001); see also Blue Water Envtl., Inc., 60 Fed. Cl. at 51 ("It is well-settled that for purposes of determining Tucker Act jurisdiction, the definition of 'agency' in 28 U.S.C. § 451 is controlling."); Hewlett-Packard Co. v. United States, 41 Fed. Cl. 99, 103 (1998) (explaining that "it is difficult to conclude that Congress intended to substantively modify the term 'agency' with the word 'Federal'").  Therefore, "the court is not persuaded that there is a

---

[12]  Defendant argues that NAFIs "are notably absent from" the section 451 definition of "agency," contending that the common link among the various section 451 categories "is that they receive Government appropriations."  Def.'s Mot. 9.

need to look beyond title 28 to interpret the meaning of the Tucker Act."[13]  Hewlett-Packard Co., 41 Fed. Cl. at 103; see also id. ("[N]othing in the . . . legislative history suggests that Congress intended to invoke a definition from another statute.").

---

[13]  Defendant also compares the statutory definition of "agency" in section 451 with the definition contained in GAO regulations:

> Federal agency or agency means any executive department or independent establishment in the executive branch, including any wholly owned government corporation, and any establishment in the legislative or judicial branch, except the Senate, the House of Representatives, and the Architect of the Capitol and any activities under his direction.

4 C.F.R. § 21.0(c) (2009); accord 40 U.S.C. § 102(5) (2006) (containing a similar definition). Indeed, the GAO has dismissed bid protests involving NAFIs because they "do not meet the statutory definition of federal agencies; although NAFIs are generally recognized as being associated and generally supervised by their respective government entities[,] . . . NAFIs operate without appropriated funds and are not part of a government agency." Premiere Vending, B-256560, 94-2 CPD ¶ 8 (Comp. Gen. July 5, 1994); see also Sodexho Mgmt., Inc., B-289605.2, 2002 CPD ¶ 111 (Comp. Gen. July 5, 2002) (explaining that NAFIs "are not federal agencies or government corporations, and they are not typical private or commercial enterprises, although they may operate on a for-profit basis"); Military Equip. Corp. of Am., B-253708, 93-1 CPD ¶ 455 (Comp. Gen. June 11, 1993) (explaining that the Navy Exchange Service Command is a "nonappropriated fund activity of the government" and is therefore "not a federal agency").

Pursuant to the Competition in Contracting Act of 1984 ("CICA"), Pub. L. No. 98-369, 98 Stat. 494 (codified as amended at 31 U.S.C. §§ 3551-3556 (2006)), the GAO has the authority to decide protests of "[a] solicitation or other request by a Federal agency for offers for a contract for the procurement of property or services," id. § 3551(1)(A).  Although the CICA governs the GAO's bid protest jurisdiction, Banknote Corp. of Am., Inc., 365 F.3d at 1351-52, "there are textual differences between [the CICA] and the ADRA amendments to the Tucker Act conferring post-award bid protest jurisdiction on this court," CHE Consulting, Inc. v. United States, 47 Fed. Cl. 331, 337 (2000).  As the court explained in Hewlett-Packard Co.,

> this court, unlike the GAO . . . , does not derive its bid-protest jurisdiction from a federal procurement law.  The Tucker Act is not a "Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds" and is not found within title 5. . . .  As a result, cases addressing the jurisdiction of the GAO . . . are inapplicable to the Tucker Act.

41 Fed. Cl. at 104.  Accordingly, the court declines defendant's invitation to extend the GAO's reasoning related to its jurisdictional grant to determine the breadth of Tucker Act jurisdiction.

15

Plaintiff has not argued that the AAFES is a "department," an "independent establishment," a "commission," an "administration," an "authority," a "board or bureau of the United States," or a "corporation in which the United States has a proprietary interest" such that it is a "Federal agency" for purposes of the ADRA.  If she had advanced such an argument, however, plaintiff would have been unsuccessful.  As an initial matter, the court notes that the terms used in the section 451 definition of "agency" are not further defined in title 28 of the United States Code.  Thus, the court turns to title 5 of the United States Code for elucidation. Connolly v. United States, 1 Cl. Ct. 312, 314-15 (1982) (relying upon definitions contained in title 5 of the United States Code for the purpose of determining jurisdiction under the Tucker Act), aff'd in part, rev'd in part, 716 F.2d 882 (Fed. Cir. 1983).  The United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") has determined that the AAFES, "by statutory definition[,] is not an executive department, military department, executive agency, or independent establishment" within the meaning of title 5 of the United States Code, Honeycutt v. Long, 861 F.2d 1346, 1349 (5th Cir. 1988), and the court has found neither binding nor persuasive authority to the contrary.  Therefore, the court determines that the AAFES is not a "Federal agency" under section 1491(b).

Because the court determines that the AAFES is not a "Federal agency" under section 1491(b), plaintiff's bid protest claim falls outside the jurisdictional grant conferred upon the Court of Federal Claims by the ADRA.  This conclusion is ultimately supported by several district court decisions that have addressed challenges to AAFES procurements under the APA.

## 2.  Challenges to AAFES Procurements in District Court

The district court decisions addressing AAFES procurements derive from Scanwell Laboratories, Inc. v. Schaefer, 424 F.2d 859 (D.C. Cir. 1970).  In that case, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") addressed whether an offeror that submitted a bid in a federal procurement possessed standing to seek judicial review of a contract award under the APA.  Id. at 860-62.  The district court dismissed the complaint, concluding that the plaintiff lacked standing.  Id. at 860.  The D.C. Circuit reversed, holding that an aggrieved offeror possessed standing to challenge agency action under section 10 of the APA, 5 U.S.C. § 702.  See Scanwell Labs., Inc., 424 F.3d at 869 ("[O]ne who makes a prima facie showing alleging [arbitrary or capricious abuses of discretion] on the part of an agency or contracting officer has standing to sue under section 10 of the [APA]"); see also id. (determining that, where there is a "prima facie showing of arbitrariness on the part of Government officials in regulatory action taken by them, sufficient to threaten substantial injury to the party affected, the injured party is entitled to be heard").  It explained:

> [T]he essential thrust of appellant's claim on the merits is to satisfy the public
> interest in having agencies follow the regulations which control government
> contracting.  The public interest in preventing the granting of contracts through
> arbitrary or capricious action can properly be vindicated through a suit brought by
> one who suffers injury as a result of the illegal activity, but the suit itself is

brought in the public interest by one acting essentially as a "private attorney general."

Id. at 864.  Accordingly, an offeror's ability to challenge agency procurement actions in district court under the APA has been referred to as the "Scanwell doctrine" or "Scanwell jurisdiction."

After the D.C. Circuit's ruling in Scanwell Laboratories, Inc., "for a period both the district courts and the Court of Claims exercised jurisdiction over bid protests on two separate theories." Res. Conservation Group, LLC, 597 F.3d at 1242.  In the Court of Claims, protesters could challenge contract awards using an implied contract theory, as discussed more fully below. Protesters could also challenge contract awards in district court based upon alleged violations of procurement laws or regulations, or "for lack of rationality." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1331 (citing Scanwell Labs., Inc., 424 F.2d at 876).  The district courts could award equitable relief and "considered several factors in exercising their discretion to issue or refuse to issue an injunction." Gull Airborne Instruments, Inc. v. Weinberger, 694 F.2d 838, 846 n.9 (D.C. Cir. 1982).  Nevertheless, as the D.C. Circuit cautioned in M. Steinthal & Co. v. Seamans, "Scanwell and its progeny impose[d] a concomitant responsibility upon the courts to . . . exercise with restraint the power to enjoin a procurement program."  455 F.2d 1289, 1301 (D.C. Cir. 1971).

### a.  Standing Requirements Under the APA

In order to bring a procurement action in district court, the protester was required to satisfy two requirements.  First, a protester had to allege that an agency acted wrongfully because the APA authorized district courts to review "agency action."  5 U.S.C. § 701(b)(2).  "Agency action" constitutes "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Id. § 551(13).  An "agency" means "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," with enumerated exceptions not relevant here. Id. § 551(1).  Second, a protester was required to establish standing based upon the APA provision conferring a right of review: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Id. § 702.  One such "relevant" statute implicated in protests of AAFES procurements brought in district court under the APA is the Federal Property and Administrative Services Act of 1949 ("FPASA"), 41 U.S.C. §§ 251-266a. Phoenix Air Group, Inc. v. United States, 46 Fed. Cl. 90, 101 n.12 (2000).

### b.  District Court Decisions Involving Federal Procurements

W.B. Fishburn Cleaners, Inc. v. Army & Air Force Exchange Service is an early decision involving APA review of a procurement protest and Scanwell jurisdiction. 374 F. Supp. 162 (N.D. Tex. 1974).  There, the protester challenged the procedure by which the AAFES solicited bids for a dry cleaning concession contract. Id. at 164.  The district court began its jurisdictional

analysis by determining that the AAFES was an "agency" within the meaning of the APA.  Id. at 164-65.

The district court next addressed whether, for purposes of 5 U.S.C. § 702, the FPASA constituted a "relevant statute" such that the protester had standing to bring its claim.  See id. at 165-67.  The district court explained:

> It is the gravamen of plaintiff's Complaint that the concession bid solicitation procedure precluded full and fair competition.  Therefore, if AAFES comes within the scope of 41 U.S.C. § 252 (1970), then this plaintiff as an unsuccessful bidder would come within the class of persons intended to be protected by Section 252 and, thereby, would satisfy the second element of the standing test.

Id. at 165.  Because the FPASA, in 41 U.S.C. § 252, applies only to an "executive agency," the district court turned to title 5 of the United States Code for guidance.  Id.  It concluded that the AAFES was an "executive agency" by virtue of being an "independent establishment."  Id. at 165-66.  Consequently, the district court held that a protester had standing under the APA to bring a protest against the AAFES pursuant to the FPASA.  Id. at 167.  Alternatively, the district court determined that the APA permitted judicial review of agency action without the "relevant statute" requirement.  See id. (citing 5 U.S.C. § 704, which provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review," and noting that section 704, which "eliminat[ed] the requirement that plaintiff establish a 'relevant statute,'" was jurisdictional in application (citing Bradley v. Weinberger, 483 F.2d 410, 413 (1st Cir. 1973)).

One year later, the Ellsworth Bottling Co. court reached a different result, determining that a protester could not establish standing in an AAFES procurement protest.  In that case, the protester challenged the procedure whereby the AAFES solicited and awarded contracts for soft drink vending machine concessions, contending that the defendant violated the FPASA.  408 F. Supp. at 281, 283.  Citing W.B. Fishburn Cleaners, Inc., the district court concluded that the AAFES constituted an "agency" within the meaning of the APA.  Id. at 282.

The district court, however, declined to adopt the W.B. Fishburn Cleaners, Inc. court's reasoning related to whether the FPASA was a "relevant statute" for purposes of APA standing.  Instead, it determined that the AAFES was not encompassed under the FPASA:

> [T]he AAFES is not an executive department and it can only be found to be an executive agency within the meaning of 41 U.S.C. [§] 252 if its meets the "independent establishment" criteria of 40 U.S.C. [§] 472.[14]  The term "independent establishment" . . . is defined by 5 U.S.C. [§] 104 as:

---

[14]  The definitions previously set forth in section 472, which apply to the FPASA, are now codified at 40 U.S.C. § 102.

> ". . . an establishment in the executive branch . . . which is not an
> Executive department, military department, Government
> corporation, or part thereof, or part of an independent
> establishment . . ."

Id. at 283-84 (footnote added).  It criticized the W.B. Fishburn Cleaners, Inc. court's contrary
reasoning for two reasons.  First, it asserted that the W.B. Fishburn Cleaners, Inc. court did not
consider joint Army and Air Force regulations that made it "clear that the AAFES is a dependent
part of the Departments of Army and Air Force."  Id. at 284 n.3.  Second, it maintained that the
W.B. Fishburn Cleaners, Inc. court

> considered, in the construction of 5 U.S.C. [§] 104, that the words "or part
> thereof" were intended to modify only "Government corporation" and not
> "Executive department, military department."  This Court would reject such a
> construction.  Reason dictates that if an Executive or military department is
> excluded from the section's coverage, an integral part thereof would also be
> excluded.

Id.  It concluded that "there is no reason to suppose that Congress intended that the AAFES be
required to procure goods and services in accordance with the [FPASA]."  Id. at 285.

   In addition to determining that the AAFES was not subject to the FPASA, the district
court declined to adopt the W.B. Fishburn Cleaners, Inc. court's holding that 5 U.S.C. § 702
conferred jurisdiction without regard to a "relevant statute," explaining:

> [T]he court indicated that 5 U.S.C. [§] 704 is jurisdictional in application.  In so
> doing[,] the [W.B.] Fishburn [Cleaners, Inc.] court relies on Bradley v.
> Weinberger.  However, upon a close reading of Bradley, . . . it is clear that the
> Bradley court recognizes the requirement that an aggrieved party satisfy the
> aforementioned two prong standing requirement of 5 U.S.C. [§] 702 before he is
> entitled to proceed under 5 U.S.C. [§] 704.

Id. at 285 n.5.  Consequently, the district court concluded that the protester lacked standing under
the APA to assert a claim against the AAFES.  Id. at 285.

   A few subsequent district court decisions concluded that the absence of a relevant statute
was not an impediment to establishing standing in a bid protest brought pursuant to the APA.
For example, in Hayes International Corp. v. McLucas, the Fifth Circuit affirmed a determination
that the protester possessed standing without invoking a particular statute.  509 F.2d 247, 254
(11th Cir. 1975).  Noting that "the plaintiff cannot rely on any specific statute authorizing judicial
review of administrative decision-making," id. at 255, the Fifth Circuit adopted two tests that a
protester must satisfy in order to establish standing: (1) injury in fact; and (2) zone of interest, id.
at 255-56.  As to the former, it explained that "the economic injury suffered my a losing bidder in

seeking a government procurement contract is manifest." Id. at 255.  As to the latter, it determined that "the interests of competitors are at least arguably within the zone of interests protected by the Department of Defense regulations against organizational conflicts of interest." Id. at 256.

In Leath, McCarthy & Maynard, Inc. v. Army & Air Force Exchange Service, the district court entertained a protest of an AAFES solicitation involving a contract for the supply of women's hosiery.  604 F. Supp. 514, 515 (N.D. Tex. 1985).  The court did not analyze whether it possessed jurisdiction over the protest in ruling upon the protester's motion for a preliminary injunction.  Instead, it implicitly applied the W.B. Fishburn Cleaners, Inc. and Hayes International Corp. line of reasoning, citing the AAFES's procurement instruction manual and determining that those "promulgations carry the full force and effect of law," id. at 517 (citing Standard Oil Co. of Cal., 316 U.S. at 484), to conclude that the protester possessed standing.

A similar determination resulted in Georgia Gazette Publishing Co. v. U.S. Department of Defense, 562 F. Supp. 1000 (S.D. Ga. 1983).  There, the district court determined that procedures for "the making of contracts for civilian enterprise publications," which were deemed issued by the Secretary of Defense pursuant to 5 U.S.C. § 301, had the force of law.  Id. at 1004. It concluded that the plaintiff alleged a violation of a regulation that had the force of law and possessed standing.  Id.

The district court in Computerware, Inc. v. Knotts also addressed questions of sovereign immunity and jurisdiction in connection with the alleged amendment of a list of approved items for sale at a United States Marine Corps exchange in violation of the Armed Services Exchange Regulations.  626 F. Supp. 956, 958-59 (E.D.N.C. 1986).  It determined that the regulations at issue were "sufficiently formal to provide a proper basis for a suit in federal court."  Id. at 960. The district court then concluded that the plaintiff had standing to pursue its claim because "[t]he challenged action has caused an identifiable injury and plaintiff is a 'local dealer' within the class of persons the Exchange Regulations are designed to protect."  Id. (citing Ellsworth Bottling Co., 408 F. Supp. at 282).

However, in a 1995 decision, MCI Telecommunications Corp., the district court rejected the reasoning set forth in cases such as W.B. Fishburn Cleaners, Inc., Leath, McCarthy & Maynard, Inc., Computerware, Inc., and Georgia Gazette Publishing Co.  Instead, in addressing a challenge to an AAFES procurement and the issuance of an award to a competitor, the district court returned to the standard articulated in Ellsworth Bottling Co. and determined that the protester lacked standing to bring its protest.  1995 WL 317435, at *1, 7.  It acknowledged that section 702 of the APA authorized protesters to obtain judicial review of agency action in district court.  Id. at *6.  It also recognized that the AAFES was "generally an 'agency' subject to review within the meaning of 5 U.S.C. § 702."  Id.  Although it observed that the protester established an injury in fact, thereby satisfying the first part of the standing test articulated in Hayes International Corp., the district court concluded that the protester could not demonstrate that the interest sought to be vindicated was "within the zone of interest to be protected or regulated by

the statute in question."  Id.

First, the district court determined that the FPASA "cannot form the statutory basis for the plaintiff's challenge because the FPASA does not apply to [the] AAFES."  Id.  It explained that the FPASA, "by its own terms[,] does not apply to the Department of Defense" and that the AAFES was part of the Department of Defense.  Id. (citing 41 U.S.C. § 252(a)(1)).  Furthermore, it held that the AAFES did not meet the statutory definition of the term "executive agency," as used in the FPASA.  Id.  Consequently, the district court concluded that a protester could not rely upon the FPASA to confer standing.  Id.

Second, the district court rejected the argument that AAFES procurement procedures and regulations could form the basis upon which the protester could demonstrate standing.  It explained: "[T]hese instructions, procedures, and joint regulations, lack sufficient formality to have the force and effect of law.  Moreover, the plaintiff has not identified any statute that serves as a basis for these 'regulations' which would provide it standing."  Id. at *7.  Accordingly, the district court, concluding that "none of the regulations at issue were promulgated pursuant to the authority of any procurement statute," held that "these regulations and policy statements cannot confer standing on the plaintiff or provide the court with a basis for review under the [APA]."[15]

None of the district court decisions discussed above is binding on the court.  AINS, Inc., 365 F.3d at 1336 n.1.  Nevertheless, the court determines that Ellsworth Bottling Co., which criticized the reasoning set forth in W.B. Fishburn Cleaners, Inc., and MCI Telecommunications Corp., which provided the most recent district court consideration of a challenge to an AAFES procurement under the APA, carry greater persuasive weight than cases such as W.B. Fishburn Cleaners, Inc., Leath, McCarthy & Maynard, Inc., Computerware, Inc., and Georgia Gazette Publishing Co.  See id.  Thus, based upon Ellsworth Bottling Co. and MCI Telecommunications Corp., the court concludes that protesters could not challenge AAFES procurements in district court under the APA based upon the Scanwell doctrine.

### 3.  The Federal Courts Improvement Act of 1982 ("FCIA")

As noted previously, protesters could challenge procurements in district court or before the Court of Claims under two distinct theories.  Whereas the district courts exercised Scanwell jurisdiction to review agency actions in connection with procurements, the Court of Claims entertained such cases "on a limited basis under a theory that the government made an implied contract with prospective bidders to fairly consider their bids."  Emery Worldwide Airlines, Inc., 264 F.3d at 1078.  For example, in Heyer Products Co. v. United States, the Court of Claims explained that one "implied condition" inherent in a request for proposals from offerors was "that

---

[15]  In so holding, the district court declined to follow Leath McCarthy & Maynard, Inc., explaining that the district court in that case provided "no analysis" as to whether AAFES regulations carried the force and effect of law.  MCI Telecomms. Corp., 1995 WL 317435, at *7 n.12.

each [proposal] would be honestly considered, and that that offer which in the honest opinion of the contracting officer was most advantageous to the Government would be accepted." 140 F. Supp. 409, 412 (Ct. Cl. 1956). It elaborated: "The Government is under the obligation to honestly consider [a proposal] and not to wantonly disregard it." Id. at 413. If the government breached that obligation, then the bidder could maintain an action for money damages to recover expenses incurred during the preparation of its proposal. Id. at 413-14; see also Keco Indus., Inc. v. United States, 428 F.2d 1233, 1237 (Ct. Cl. 1970) ("[E]very bidder has the right to have his bid honestly considered by the Government, and if this obligation is breached, then the injured party has the right to come into court to try and prove his cause of action."). Bid protest jurisdiction under the Tucker Act, therefore, "'was narrow[,] and an aggrieved party was typically limited to monetary relief,' such as costs associated with undertaking the bidding process."[16] Res. Conservation Group, LLC, 597 F.3d at 1242 n.7; see also M. Steinthal & Co., 455 F.2d at 1302 (acknowledging the availability of a damages remedy in the Court of Claims that "will compensate the frustrated bidder's realized financial losses (i.e., the bid preparation costs) resulting from the illegal agency action").

In 1982, Congress enacted the FCIA, Pub. L. No. 97-164, § 133(a), 96 Stat. 25, 40 (1982) (codified at 28 U.S.C. § 171), which conferred upon the United States Claims Court ("Claims Court") jurisdiction to grant declaratory and injunctive relief.[17] Congress explained that, by "conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee d[id] not intend to alter the current state of the substantive law in this area. Specifically, the Scanwell doctrine as enunciated by the D.C. Circuit . . . [wa]s left in tact . . . ." S. Rep. No. 97-275, at 23 (1981), reprinted in 1982 U.S.C.C.A.N. 11, 33 (1982) (emphasis added). As the Federal Circuit explained, the "essence" of the Scanwell doctrine, which Congress applied to the Claims Court, was that "an unsuccessful bidder has standing to challenge a proposed contract award on the ground that in awarding the contract the government violated statutory and procedural requirements."[18] CACI, Inc.-Fed. v.

---

[16] As the Supreme Court stated in United States v. Jones, the language of the Tucker Act is "properly applicable only to a money claim." 131 U.S. 1, 19 (1889).

[17] Pursuant to the FCIA, the Claims Court succeeded the Court of Claims.

[18] After the FCIA was enacted, the Federal Circuit held that the Claims Court's bid protest jurisdiction was limited to "preaward" cases:

The court obviously could not "enjoin the award" of contracts already awarded. Nor would a declaratory judgment be appropriate after award. There is nothing anywhere in the legislative history referring to any power in the Claims Court to undo or vacate an awarded contract by way of mandatory injunction or otherwise.

The legislative history thus establishes the intent of Congress, which must be our lodestar that equitable power was to be exercised only in contract actions

United States, 719 F.2d 1567, 1574 (Fed. Cir. 1983).  By enacting the FCIA, Congress "intended the Claims Court to have the same authority over suits by unsuccessful bidders (brought before the contract was awarded) that the district courts had under Scanwell."  Id. at 1573 (citation omitted).  In other words, the Claims Court could entertain pre-award procurement challenges based upon either (1) an implied contract theory, wherein a protester could recover money damages in the form of bid preparation costs; or (2) the newly conferred jurisdiction under the FCIA, which enabled a protester to obtain pre-award equitable relief.

The Claims Court encountered at least one protest involving the AAFES.  In Quality Furniture Rentals, Inc. v. United States, the protester alleged numerous irregularities in an AAFES procurement and claimed that the contract award "would have a ruinous effect on the furniture rental business" in the surrounding vicinity.  1 Cl. Ct. 136, 137-38 (1983).  The court acknowledged that the FCIA conferred upon it equitable jurisdiction to provide complete relief on any contract claim brought before a contract was awarded.  Id. at 138-39.  Nevertheless, Chief Judge Alex Kozinski determined that the court lacked jurisdiction over the protester's procurement violation claim.  Id. at 138-39.  The court noted that the protester challenged the manner in which the AAFES conducted the procurement.  Id. at 140.  Observing that "none of the pre-FCIA bid protest cases involved such claims," the court explained that it was "difficult to ascertain whether Congress intended the court to consider such allegations in ruling on petitions for injunctive relief."  Id.  Following an analysis of the FCIA's legislative history, the court concluded that Congress "did not intend that this court consider every alleged irregularity involving an award but only those irregularities which would deny a contractor a fair opportunity to compete."  Id. (emphasis added).  Reasoning that Congress "did not change the state of the substantive law and its unequivocal expression of intent that we limit or equitable jurisdiction to cases involving the denial of a fair opportunity to compete for a contract," the court held that it lacked jurisdiction over claims of improprieties in the procurement process absent allegations that the improprieties adversely affected a protester's opportunity to compete for the procurement award.  Id. at 141.

**4.  The ADRA and Consolidation of Bid Protest Actions in the Court of Federal Claims**

As a result of the Federal Circuit's decision in John C. Grimberg Co., protesters had "the opportunity to select between the different district courts, as well as the [Claims Court], in bringing their claims," which resulted in a lack of uniformity in bid protest jurisprudence.

---

brought in the Claims Court prior to award. . . .

Because the statute and its legislative history leave no doubt that Congress intended the equitable power of the Claims Court to be exercised only before an award is made, that power can be invoked only by filing a claim with the court before a contract is awarded . . . .

United States v. John C. Grimberg Co., 702 F.2d 1362, 1372 (Fed. Cir. 1983).

Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332; see also 142 Cong. Rec. 26646 (1996) (acknowledging that "overlapping authority has led to forum shopping and has resulted in unnecessary and wasteful litigation over jurisdictional issues").  In order "to prevent forum shopping and to promote uniformity in government procurement award law, Congress sought to channel the entirety of judicial government contract procurement protest jurisdiction to the Court of Federal Claims."  Emery Worldwide Airlines, Inc., 264 F.3d at 1079; accord 142 Cong. Rec. 26646 (1996) (stating that there "should be only one judicial system for consideration of bid protests and that forum should have jurisdiction to consider all protests which can now be considered by the district courts and by the Court of Federal Claims"[19] and that the Court of Federal Claims "should be the single judicial forum with jurisdiction to consider all protests that can presently be considered by any district court or by the Court of Federal Claims" (footnote & emphasis added)).

By enacting the ADRA, Congress "expanded the jurisdiction of the Court of Federal Claims to hear bid protest cases," Res. Conservation Group, LLC, 597 F.3d at 1243 (emphasis added), thereby giving the court "exclusive jurisdiction to review the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims."[20]  H.R. Rep. No. 104-841, at 10 (1996) (Conf. Rep.) (emphasis added).  Furthermore, Congress envisioned that the ADRA was "not intended to affect the jurisdiction or standards applied by the Court of Federal Claims in any other area of law."  Id.; see also PGBA, LLC v. United States, 389 F.3d 1219, 1227 (Fed. Cir. 2004) (explaining that Congress, through the ADRA, "abolished Scanwell jurisdiction in an effort to create uniformity").  "This legislative history indicates that Congress intended to confer on the Court of Federal Claims jurisdiction previously exercised only by district courts under Scanwell."  Am. Fed'n of Gov't Emps., AFL-CIO, 258 F.3d at 1300 (emphasis added); see also Novell, Inc. v. United States, 109 F. Supp. 2d

---

[19]  The Claims Court was renamed the Court of Federal Claims in 1992.  See Court of Federal Claims Technical and Procedural Improvements Act of 1992, Pub. L. No. 102-572, § 902(a)(1), 106 Stat. 4506, 4516.

[20]  The ADRA was

designed to increase the efficiency of our procurement system by consolidating jurisdiction over bid protest claims in the Court of Federal Claims.  The [legislation] would reverse the decision of the D.C. Circuit in Scanwell Lab[s]., Inc. . . . that permitted bid protests to be filed in any district court across the country.  Providing district courts with jurisdiction to hear bid protest claims has led to forum shopping and the fragmentation of Government contract law.  Consolidation of jurisdiction in the Court of Federal Claims is necessary to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum.

142 Cong. Rec. 13817 (1996).

22, 24-25 (D.D.C. 2000) (explaining that "there no longer is such an independent, APA-based jurisdiction for the district courts in government bid protest cases; rather, Congress effectively subsumed APA jurisdiction of the district courts into the more specific jurisdictional language of ADRA," and emphasizing that the "ADRA . . . subsumed the district courts' previous Scanwell jurisdiction over such cases"); accord Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332 ("Under the ADRA, all bid protest actions under the APA are now reviewed under the standards applied in the Scanwell line of cases.")

In American Federation of Government Employees, AFL-CIO, the Federal Circuit examined the breadth of the newly conferred jurisdiction upon the Court of Federal Claims:

> The question is what Congress meant when it referred to "Scanwell jurisdiction." . . .  [P]rior to the ADRA, the Court of Federal Claims had jurisdiction over only pre-award protests, while, under Scanwell, the district courts had jurisdiction over post-award protests.  The ADRA gave the Court of Federal Claims jurisdiction over post-award protests.  Thus, the ADRA clearly conferred the Court of Federal Claims with "Scanwell jurisdiction," inasmuch as it permitted the Court of Federal Claims to hear post-award protests. . . .

> The issue . . . , however, is whether Congress intended to expand the class of parties who can bring bid protest actions in the Court of Federal Claims.  On the one hand, Congress could have intended the Court of Federal Claims' "Scanwell jurisdiction" to encompass complaints brought by disappointed bidders only. . . .

> On the other hand, because Scanwell itself is based on the APA, Congress could have intended to give the Court of Federal Claims jurisdiction over any contract dispute that could be brought under the APA.

258 F.3d at 1301 (footnote omitted).  It concluded that "Scanwell jurisdiction" referenced "the district courts' jurisdiction over bid protest cases brought under the APA by disappointed bidders, like the plaintiff in Scanwell" since Congress, when defining standing under section 1491(b)(1), "did not use the broad language of the APA . . . ."  Id. at 1302.  Congress, the Federal Circuit concluded, "did not explicitly invoke the APA standing requirements" and did not intend to confer standing on "anyone who might have standing under the APA."  Id.

Pursuant to the ADRA, the Court of Federal Claims "is authorized to execute the same jurisdiction as the district courts did under Scanwell jurisdiction."  Automated Commc'n Sys., Inc. v. United States, 49 Fed. Cl. 570, 576 (2001).  By reviewing bid protests pursuant to section 1491(b), the court "merely is exercising jurisdiction using the APA standard of review; it is not reviewing agency action under the APA."  MTB Group, Inc. v. United States, 65 Fed. Cl. 516, 523 (2005) (citing Banknote Corp. of Am., 365 F.3d at 1350-51) (emphasis added); Spherix, Inc. v. United States, 62 Fed. Cl. 497, 503 (2004); accord CC Distribs., Inc. v. United States, 38 Fed.

Cl. 771, 777 (1997) (explaining that the ADRA's reference to the APA concerned section 706, which contains the standard of review, and not section 702, which pertains to standing).  As explored above, several district courts concluded that they lacked APA jurisdiction over challenges to AAFES procurements because protesters could not demonstrate that they came within the zone of interests protected by a statute that the agency allegedly violated.  The most recent district court case to address an AAFES procurement, MCI Telecommunications Corp., rejected a line of cases exercising jurisdiction in the absence of a statutory basis upon which the protester's standing was grounded.  Because Congress "codif[ied] the Scanwell jurisdiction with the enactment of Section 1491(b)," Novell, Inc., 109 F. Supp. 2d at 25, the Court of Federal Claims lacks section 1491(b) jurisdiction over bid protests that could not have been brought in district court.  See Am. Fed'n of Gov't Employees, AFL-CIO, 258 F.3d at 1300 (explaining that Congress conferred upon the Court of Federal Claims "jurisdiction previously exercised only by district courts under Scanwell").

**5.  The Court Cannot Entertain Plaintiff's Protest Under Section 1491(b)**

Based upon Ellsworth Bottling Co. and MCI Telecommunications Corp., district courts did not possess Scanwell jurisdiction over challenges to AAFES procurements.  Accordingly, the ADRA did not confer upon the Court of Federal Claims jurisdiction to entertain such challenges.[21]  Moreover, because Congress did not intend to confer standing on every protester that might have had standing under the APA when it enacted the ADRA, Am. Fed'n of Gov't Emps., AFL-CIO, 258 F.3d at 1302, the standing determinations set forth in W.B. Fishburn Cleaners, Inc. and Leath, McCarthy & Maynard, Inc., both of which involved AAFES procurements, are not dispositive in terms of establishing standing under section 1491(b).[22]  Consequently, the court's ability to exercise jurisdiction over plaintiff's challenge to an AAFES

---

[21]  The court declines to treat the Southern Foods, Inc. court's passing statement that the NAFI doctrine has no application under the court's bid protest jurisdiction, 76 Fed. Cl. at 775 & n.8, as an expansion of its jurisdiction.  To the extent that the court's statement is not mere dictum, it is neither precedential nor binding authority.  Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1307 (Fed. Cir. 2004).  The court also determines that the Southern Foods, Inc. court's statement is not persuasive since that court did not encounter a NAFI protest.  Moreover, the Southern Foods, Inc. court did not engage in any discussion related to the scope of bid protest review conferred upon the Court of Federal Claims by the ADRA.

[22]  Indeed, questions of standing under the APA are separate and distinct from question of standing under section 1491(b).  Standing is, of course, a "threshold jurisdictional issue."  Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002).  "Every plaintiff must have standing to invoke the court's jurisdiction over a bid protest."  CS-360, LLC v. United States, No. 10-467C, 2010 WL 3590163, at *5 (Fed. Cl. Sept. 16, 2010).  In bid protests, standing "is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III."  Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (emphasis added).

procurement cannot be grounded in the transfer of <u>Scanwell</u> jurisdiction from the district courts to the Court of Federal Claims under the ADRA.  Therefore, section 1491(b) affords plaintiff no jurisdiction.

**B.  The Court Possesses Jurisdiction Over Plaintiff's Protest Under Section 1491(a)(1)**

Where the ADRA does not provide jurisdiction over certain claims, the Federal Circuit has held that implied-in-fact contract jurisdiction remains available.  <u>Res. Conservation Group, LLC</u>, 597 F.3d at 1245.  In <u>Resource Conservation Group, LLC</u>, the United States Naval Academy ("Navy") issued a Request of Interest for proposals to lease property that was utilized as a dairy farm.  <u>Id.</u> at 1240.  After receiving an expression of interest from the protester, Resource Conservation Group ("RCG"), and other parties, the Navy issued a Notice of Availability for Lease.  <u>Id.</u>  Interested bidders toured the property, and RCG toured the property twice in order to survey and test the area for the presence of sand and gravel.  <u>Id.</u>  Thereafter, RCG submitted a proposal to lease the property in order to mine it for sand and gravel.  <u>Id.</u> at 1241.

The Navy apprised RCG that its proposal did not fall within the scope of the solicitation because the disposal of sand and gravel, which were construed as real property pursuant to 41 C.F.R. § 102-71.20, was prohibited.  <u>Id.</u>  The Navy contended that it had no obligation during the prebid process to apprise RCG that its bid would not be reviewed.  <u>Id.</u>  RCG filed a bid protest with the GAO, which dismissed the protest on the basis that a solicitation regarding a lease of government-owned land did not constitute a procurement of property or services and was therefore outside the GAO's bid protest jurisdiction.  <u>Id.</u>  RCG thus filed suit in the Court of Federal Claims.  <u>Id.</u>  The court held that it lacked jurisdiction under 28 U.S.C. § 1491(b)(1) to adjudicate bid protests involving leases of land where the government was the lessor because the action was not in connection with a procurement or proposed procurement.  <u>Id.</u> at 1242.  It also held that the right to sue under an implied-in-fact contract pursuant to 28 U.S.C. § 1491(a)(1) was impliedly repealed when section 1491(b)(1) was enacted as part of the ADRA.  <u>Id.</u> at 1241.

The Federal Circuit affirmed the trial court's determination that RCG's claim was not encompassed within section 1491(b)(1).[23]  <u>Id.</u> at 1243-45.  However, it reversed the trial court's ruling that the Court of Federal Claims lacked jurisdiction under section 1491(a)(1).  <u>Id.</u> at 1245-47.  The Federal Circuit observed that the Court of Federal Claims, prior to the enactment of

---

[23]  The Federal Circuit reasoned that the definitions of "procurement" and "procure," as contained in the ADRA, "signify the act of obtaining or acquiring something, in the context of acquiring goods or services.  It strains the ordinary meaning of 'procurement' to extend that definition to encompass a situation in which it is the government that is seeking to lease its own property."  <u>Res. Conservation Group, LLC</u>, 597 F.3d at 1244.  Moreover, it determined that the "process involved in soliciting lessees for government-owned property cannot be characterized as a 'process of acquiring property or services.'"  <u>Id.</u>  As such, the Federal Circuit concluded that section 1491(b)(1) is "exclusively concerned with procurement solicitations and contracts."  <u>Id.</u>

section 1491(b)(1), exercised jurisdiction over solicitations for the sale of government property and nothing in the ADRA repealed that jurisdiction.  Id. at 1245-46.  Analyzing the ADRA's legislative history, the Federal Circuit explained that the statute "was meant to unify bid protest law in one court under one standard.  However, it seems quite unlikely that Congress would intend that statute to deny a preexisting remedy without providing a remedy under the new statute."  Id. at 1246.  Therefore, it concluded that "Congress did not intend to alter or restrict the Court of Federal Claims' existing jurisdiction in cases not covered by the new statute."  Id.

The Federal Circuit restricted its analysis in Resource Conservation Group, LLC to a claim that did not fall within the court's bid protest jurisdiction under section 1491(b)(1).  Since RCG could not bring its claim pursuant to section 1491(b)(1), RCG invoked the court's section 1491(a)(1) implied-contract jurisdiction over nonprocurement solicitations.  Id. at 1241.  The Federal Circuit concluded that the Court of Federal Claims possessed jurisdiction over RCG's implied-in-fact contract claim: "Congress intended . . . [section] 1491(b)(1) jurisdiction to be exclusive where [section] 1491(b)(1) provided a remedy (in procurement cases)."  Res. Conservation Group, LLC, 597 F.3d at 1245-46 (emphasis added); see also FAS Support Servs., LLC v. United States, 93 Fed. Cl. 687, 694 (2010) (ruling by the Honorable James F. Merow that the court possessed jurisdiction over an implied-in-fact contract to have bids fairly and honestly considered pursuant to 28 U.S.C. § 1491(a)(1) and noting the difference in relief available under section 1491(b)(1) (equitable) and section 1491(a)(1) (monetary, limited to the costs incurred in preparing the proposal and bid) (citing Keco Indus. Inc., 428 F.2d at 1240)); Creation Upgrades, Inc. v. United States, No. 09-788C, 2010 WL 1255684, at *1-2 (Fed. Cl. Mar. 24, 2010) (unpublished decision) (dismissing for lack of jurisdiction, in light of Resource Conservation Group, LLC, portions of the complaint that sought declaratory and injunctive relief related to the disposition of government property but construing the remaining allegations as within the framework of the government's implied obligation to consider bids honestly and fairly under section 1491(a)(1)).  In a recent decision, L-3 Communications Integrated Systems, L.P. v. United States, the Honorable Mary Ellen Coster Williams explained:

> The [ADRA] . . . does not delete implied-in-fact or express procurement contracts from its reach.  Section 1491(a)(1) continues to allow any plaintiff, including a disappointed bidder, to invoke this Court's general contract jurisdiction to recover money damages, including bid preparation and proposal costs.  The revision of [section] 1491(b) did not terminate the implied contract of fair dealing.  Nor did a cause of action for breach of the implied cont[r]act of fair dealing under § 1491(a) cease to exist simply because a breach occurred in the context of a procurement decision and could also be denominated a "bid protest."

94 Fed. Cl. 394, 397 (2010) (emphasis added).

The court agrees with Judges Merow and Williams.  As noted above, the Federal Circuit concluded that the court's implied-in-fact contract jurisdiction, which existed prior to the 1996 enactment of the ADRA, remains viable.  In L-3 Communications Integrated Systems, L.P.,

28

Judge Williams explained that the Federal Circuit did "not hold that [the] ADRA eliminated [section] 1491(a) jurisdiction in a breach of implied contract action involving a procurement." 94 Fed. Cl. at 398.  Thus, while plaintiff cannot maintain her protest under section 1491(b), she may bring her protest under section 1491(a)(1), which confers upon the Court of Federal Claims jurisdiction over an implied-in-fact contract for the fair and honest consideration of a proposal with the AAFES.  See 28 U.S.C. § 1491(a)(1); see also Am. Compl. ¶ 4 (alleging jurisdiction based, in part, upon 28 U.S.C. § 1491(a)(1)).  Under section 1491(a)(1), plaintiff is precluded from obtaining equitable relief, which is only available for a section 1491(b)(1) protest, and is limited to a recovery of monetary damages that comprise the costs she incurred while preparing her proposal.  See FAS Support Servs., LLC, 93 Fed. Cl. at 694 (citing Keco Indus., Inc., 428 F.2d at 1240).  Accordingly, defendant's motion to dismiss plaintiff's bid protest claim for lack of jurisdiction pursuant to RCFC 12(b)(1) is denied.

## IV.  PLAINTIFF'S CDA CLAIM

Defendant moves to dismiss plaintiff's CDA claim for lack of jurisdiction because plaintiff "failed to allege that she submitted any claim to the contracting officer, as is required under the CDA."  Def.'s Mot. 14.  Defendant also asserts that plaintiff's allegations of racial and gender discrimination fall outside the court's jurisdiction.  Id.  Alternatively, defendant requests that the court dismiss plaintiff's CDA claim for failure to state a claim upon which relief can be granted because plaintiff did not plead facts sufficient to support her claim.  Id.  Plaintiff did not respond to defendant's arguments.  Cf. McNutt, 298 U.S. at 189 (indicating that a plaintiff may not rely solely upon allegations in the complaint and must bring forth relevant, adequate proof to establish jurisdiction when jurisdiction is questioned).

### 1.  Plaintiff Does Not Allege That She Submitted a Claim to the Contracting Officer

Under the CDA, if a contractor has a dispute with the government "relating to a contract," then it shall make a written claim to the contracting officer.  41 U.S.C. § 605(a).  The CDA does not define the meaning of the word "claim."  M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010).  Therefore, in order to determine whether a contractor's demand constitutes a "claim," the court must look to the regulations "implementing the CDA, the language of the contract in dispute, and the facts of the case."  Reflectone, Inc., 60 F.3d at 1575 (citing Garrett v. Gen. Elec. Co., 987 F.2d 747, 749 (Fed. Cir. 1993)).  The Federal Acquisition Regulation ("FAR") defines a "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract."  48 C.F.R. § 52.233-1(c); accord Reflectone, Inc., 60 F.3d at 1576 (holding that the FAR "requires a 'claim' to be a written demand seeking a sum certain (or other contract relief) as a matter of right").  The submission of a proper claim is a jurisdictional requirement under the CDA.  See, e.g., James M. Ellett Constr. Co., 93 F.3d at 1541-42.

"[T]he phrase 'as a matter of right' in the regulatory definition of a 'claim' requires only that the contractor specifically assert entitlement to the relief sought.  That is, the claim must be a demand for something due or believed to be due . . . ."  <u>Alliant Techsys., Inc. v. United States</u>, 178 F.3d 1260, 1265 (Fed. Cir. 1999); <u>see also</u> <u>Precision Pine & Timber, Inc. v. United States</u>, 62 Fed. Cl. 635, 643 (2004) (defining a "claim" as "'[a] demand for something as due; an assertion of a right to something'" (quoting 3 <u>Oxford English Dictionary</u> 261 (2d ed. 1989))).  The CDA contains "no requirement . . . that a 'claim' must be submitted in any particular form or use any particular wording."  <u>Contract Cleaning Maint., Inc. v. United States</u>, 811 F.2d 586, 592 (Fed. Cir. 1987); <u>see also</u> <u>GPA-I, LP v. United States</u>, 46 Fed. Cl. 762, 767 (2000) (noting that a contractor need not employ "'[m]agic words'" (quoting <u>Transam. Ins. Corp. v. United States</u>, 973 F.2d 1572, 1578 (Fed. Cir. 1992), <u>overruled in part on other grounds by</u> <u>Reflectone, Inc.</u>, 60 F.3d at 1579 & n.10)).  Rather, "[a]ll that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis . . . of the claim."  <u>Contract Cleaning Maint., Inc.</u>, 811 F.2d at 592.  In other words, "the intent of the 'claim' governs."  <u>Transam. Ins. Corp.</u>, 973 F.2d at 1576.

Claims generally must be submitted to the contracting officer: "All claims by a contractor against the government relating to a contract shall . . . be <u>submitted to the contracting officer</u> for a decision."  41 U.S.C. § 605(a) (emphasis added); <u>see also</u> <u>James M. Ellett Constr. Co.</u>, 93 F.3d at 1541-42 (requiring, as a jurisdictional prerequisite, that the contracting officer issue a final decision on the claim).  However, Congress has acknowledged the flexibility inherent in the role of a contracting officer.  <u>See</u> S. Rep. No. 95-1118, at 21-22 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5235, 5255-56 (explaining that "[w]ith so many variables, it is impossible to generalize as to what the contracting officer's role should be in all situations" and acknowledging that procuring agencies "should have flexibility in deciding what role the contracting officer will have").  Thus, the CDA "does not . . . require that the claims be sent only to the contracting officer, or necessarily directly to that officer."  <u>Neal & Co. v. United States</u>, 945 F.2d 385, 388 (Fed. Cir. 1991).  As the Federal Circuit stated in <u>Dawco Construction, Inc. v. United States</u>, the CDA "<u>simply identifies the person to whom the dispute is to be 'submitted' for a final decision</u>" and that, "once a claim is made, the parties must 'commit' the claim to the contracting officer and 'yield' to his authority to make a final decision."  930 F.2d 872, 880 (Fed. Cir. 1991) (emphasis added), <u>overruled in part on other grounds by</u> <u>Reflectone, Inc.</u>, 60 F.3d at 1579.

Plaintiff's CDA claim bears no relation to her bid protest claim.  The former concerns her concessionaire contract with the AAFES, while the latter concerns her dispute over the AAFES's decision to award a different concessionaire contract to T-Shirt House.  Ms. Dunbar was the contracting officer for the instant procurement, Am. Compl. ¶ 17, but plaintiff has not identified the contracting officer who administered her concessionaire contract.  Indeed, plaintiff does not allege that she submitted a claim to either that contracting officer or that individual's representative.  She also does not allege that the contracting officer denied any claim in a decision or the claim was deemed denied.

In situations where a defendant disputes the jurisdictional facts alleged in the complaint, the court may consider evidence outside the pleadings to determine whether it possesses jurisdiction.  Moyer, 190 F.3d at 1318.  As such, the court turns to the administrative record filed in this case to ascertain whether any evidence exists therein that confers jurisdiction upon the court to consider plaintiff's CDA claim.  The court concludes that no such evidence exists.

The only document that could be construed as a "claim" submitted by plaintiff to a contracting officer is plaintiff's December 22, 2008 letter to Ms. Dunbar.  AR 359.  This letter, however, is not a "claim" under the CDA.  First, plaintiff does not allege that Ms. Dunbar served as the contracting officer overseeing her concessionaire contract.  Therefore, plaintiff has not established that she submitted her letter to the appropriate AAFES employee who administered her concessionaire contract.  Second, the letter does not address plaintiff's concessionaire contract.  Plaintiff, an unsuccessful bidder in the procurement at issue in this case, protested the AAFES award of a concessionaire contract to T-Shirt House.  See id. ("I am contesting who you awarded the Contract to . . . .").  Plaintiff's letter, therefore, is not a written demand seeking, as a matter of right, any relief arising under or relating to her own concessionaire contract.  See 48 C.F.R. § 52.233-1(c).  Moreover, Ms. Dunbar denied plaintiff's protest, not a claim related to plaintiff's concessionaire contract: "The basis for your protest has no merit and therefore, I hereby deny your protest."  AR 356 (emphasis added).  Because plaintiff has failed to satisfy the prerequisites to invoke CDA jurisdiction in the Court of Federal Claims, see Todd Constr., L.P., 85 Fed. Cl. at 42, her CDA claim must be dismissed.

## 2.  The Court Lacks Jurisdiction Over Allegations of Racial and Gender Discrimination

Finally, plaintiff alleges that she has been subjected to racial and gender discrimination by the AAFES while she performed her concessionaire contract by operating a kiosk at Fort Benning.  Am. Compl. ¶¶ 33-38.  Discrimination claims fall within the exclusive jurisdiction of the district courts.[24]  See 28 U.S.C. § 1343(a)(4) (vesting "original jurisdiction" in the district courts over, among other things, actions "[t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights").  "To whatever extent [plaintiff] may be asserting . . . discrimination claims under Title VII of the Civil Rights Act, the Court of Federal Claims . . . lacks jurisdiction over them."  Flowers v. United States, 321 Fed. App'x 928, 934 (Fed. Cir. 2008); accord Hernandez v. United States, 93 Fed. Cl. 193, 198 (2010) ("The court does not have jurisdiction over claims arising under the Civil Rights Act, as jurisdiction over such claims resides exclusively in the federal district courts.").  Therefore, the court cannot entertain plaintiff's allegations of racial and gender discrimination and must dismiss those claims for lack of jurisdiction.  Accordingly, defendant's motion to dismiss plaintiff's CDA claim is granted pursuant to RCFC 12(b)(1).

---

[24]  The Court of Federal Claims is not a federal district court.  Simmons v. United States, 71 Fed, Cl. 188, 193 (2006); see also 28 U.S.C. ch. 5 (describing the various federal district courts).

## V.  CONCLUSION

For the reasons discussed above, defendant's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.  The Clerk of Court is directed to **DISMISS WITHOUT PREJUDICE** Count Two of the amended complaint for lack of subject matter jurisdiction. Defendant shall file its answer to Count One of the amended complaint by no later than **Friday, January 7, 2011**.

The court has filed this opinion under seal.  The parties shall confer to determine proposed redactions that are agreeable to all parties.  Then, **by no later than Friday, December 17, 2010**, the parties shall file a joint status report indicating their agreement with the proposed redactions and **attaching a complete copy of the court's opinion with all redactions clearly indicated**.

**IT IS SO ORDERED**.

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge