# In the United States Court of Federal Claims

No. 09-454 C
(Filed Under Seal: November 30, 2010)
(Reissued: December 15, 2010)[*]

```
*************************************
JOYCE TERRY,                         *
d/b/a SHIRT SHACK,                   *      Bid Protest; Motion to Supplement the
                                     *      Administrative Record; Axiom Res. Mgmt.,
                  Plaintiff,         *      Inc.; Esch; Evidence Related to Bias or
                                     *      Bad Faith; Beta Analytics Int'l, Inc.;
v.                                   *      Info Tech. & Applications Corp.; Failure
                                     *      to Plead Bias or Bad Faith by Contracting
THE UNITED STATES,                   *      Officer; Fed. R. Evid. 701; Opinion
                                     *      Testimony; Best Evidence Rule; Fed. R.
                  Defendant.         *      Evid. 1002; "Meaningful Judicial Review"
                                     *
*************************************
```

Bonnie Michelle Smith, Warner Robins, GA, for plaintiff.

Arlene Pianco Groner, United States Department of Justice, Washington, DC, for defendant.

## RULING ON PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

**SWEENEY**, Judge

Before the court in this post-award bid protest is plaintiff's motion to supplement the administrative record ("motion to supplement"). In this case, plaintiff Joyce Terry, doing business as the Shirt Shack, asserts that the Army and Air Force Exchange Service ("AAFES") unlawfully awarded a contract for the manufacture of T-shirts as part of a concession operation at Fort Benning in Columbus, Georgia to a vendor that plaintiff alleges did not satisfy certain requirements set forth in the solicitation. Plaintiff also asserts a claim under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613 (2006), contending that the AAFES violated the law with respect to a contract under which she is currently performing as a kiosk operator at Fort Benning. The government has moved, pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), to dismiss the complaint and opposes plaintiff's motion to supplement. For the reasons discussed below, plaintiff's motion to supplement is denied.

---

[*] On December 14, 2010, the parties filed a joint status report indicating that no redactions were necessary.

# I. BACKGROUND[1]

## A. The Solicitation

On October 6, 2008, the AAFES issued a solicitation for proposals related to the operation of a T-shirt concession at Fort Benning commencing March 22, 2009, for a period of no greater than five years. Am. Compl. ¶ 5; AR 33-95. Gross monthly sales from the concession operation were estimated at $45,000 per month. AR 37. Offerors were advised to contact the contracting officer, Kay K. Dunbar, with any questions about the solicitation. Id. at 18, 35. The solicitation provided that the contracting officer was the only individual authorized to "waive or change contract terms[ and] impose additional contract requirements . . . ." Id. at 40.

Plaintiff maintains that offerors were required to own certain garment ink printing equipment in order to participate in the solicitation. Exhibit G of the solicitation, titled "Concessionaire Furnished Equipment," enumerated the type and quantity of equipment that the concessionaire was required to furnish at two concessionaire locations. Id. at 73. The equipment required at the main exchange building included a heat transfer press and a transfer machine, which were required to "be new or in 'like new' condition . . . ." Id. The heat transfer press had to be "[c]apable of transferring rubber based and sublistatic ink transfers. Insta Model 515 or equivalent." Id. The transfer machine had to be "[c]apable of transferring decals to caps/hats. Insta Model 412 or equivalent." Id. The solicitation also required that "[h]eat pressed items . . . be offered on a while-you-wait-basis." Id. at 75. All equipment furnished by the concessionaire was subject to the following terms: (1) title to the equipment remained with the concessionaire; (2) concessionaires were permitted to lease equipment so long as they provided the contracting officer with the name and address of the lessor; (3) a concessionaire's investment in any equipment constituted a business risk that the concessionaire alone assumed; and (4) neither the AAFES nor any other agency or instrumentality of the United States was liable to the concessionaire for the cost of the concessionaire's investment in equipment in the event that the contract was terminated without extension. Id. at 55.

Plaintiff began selling T-shirts with her husband in 2000 and worked as an AAFES concessionaire for over fourteen years. Id. at 198. At the time she participated in the instant procurement, plaintiff operated a separate T-shirt kiosk at Fort Benning. The T-shirts were printed off-post by her husband. Id.; Am. Compl. ¶¶ 33-35. To participate in this procurement, plaintiff "purchased a machine known as a Garment Printer which [would] let [her] do all [her] shirts at the point of sale, as well as do a customer['s] custom design requests on the spot." AR 198. She therefore believed that she possessed "all the necessary equipment[,] such as [a] Garment Printer, heat press, cap press, and mug press," that were purportedly required in order to participate in the procurement. Id.

---

[1] The facts are derived from the amended complaint ("Am. Compl."), exhibits accompanying the amended complaint ("Am. Compl. Ex."), and the administrative record ("AR").

**B.  The Procurement Process**

The AAFES received proposals from plaintiff on October 29, 2008, id. at 123; cf. id. at 180, 189-90 (indicating that plaintiff signed her proposal on October 28, 2008), T-Shirt House, the incumbent concessionaire, on November 5, 2008, id. at 156, and a third company, L & W Creations, on November 6, 2008, id. at 123-24; cf. id. at 201, 206-07 (indicating that L & W Creations signed its proposal on November 5, 2008).  As part of her proposal, plaintiff listed a fee to the AAFES of thirty percent, which was based upon total adjusted gross sales, for a contract period of five years.  Am. Compl. Ex. 1.  By comparison, T-Shirt House proposed a thirty-one percent fee and L & W Creations proposed a twenty-four percent fee.  AR 124.  Thereafter, the AAFES requested final statements and other documentation from L & W Creations, which ultimately never responded to the requests.  Id.  Consequently, L & W Creations "was found non-responsive."  Id.

On November 20, 2008, Ms. Dunbar requested a "best and final offer" from plaintiff and T-Shirt House, the two remaining offerors.  Id. at 124, 138.  Ms. Dunbar apprised plaintiff of various discrepancies in her proposal, and plaintiff, in response, submitted a modified proposal on November 21, 2008.  Id. at 137.  In her modified proposal, plaintiff increased her fee to the AAFES from thirty percent to thirty-seven percent.  Am. Compl. ¶ 12; Am. Compl. Ex. 2.  T-Shirt House modified its proposal on November 22, 2008, increasing its proposed fee to 33.1 percent.  AR 124, 172.

Ms. Dunbar determined that the best and final offers submitted by plaintiff and T-Shirt House contained fees that were "too high compared to the Region and Conus fee averages," which were 18.14 percent and 20.06 percent, respectively.  Id. at 124.  Indeed, the record reflects Ms. Dunbar's assessment that, if either bid was accepted, each offeror would be "operating in the red."  Id. at 156.  On December 2, 2008, Ms. Dunbar sent electronic-mail communications to both plaintiff and T-Shirt House requesting (1) financial information, (2) submission of a Monthly Projected Operating Statement ("MPOS"), and (3) reexamination of the costs each offeror would incur in providing the services (or similar services) encompassed by the solicitation.  Id. at 124.  Plaintiff received a letter from Ms. Dunbar requesting that she "re-examine the costs [she] may incur in providing this service" and submit an MPOS because Ms. Dunbar believed that her proposal might "be too high to operate at a profit."  Id. at 135.  Ms. Dunbar also informed plaintiff that she "may either confirm or amend [her] proposal," but a "[f]ailure to provide the information by the date/time specified . . . may result in [her] original proposal being considered for award."  Id.

On December 9, 2008, plaintiff, who alleges that furnishing another revised proposal violated the terms of the solicitation, Am. Compl. ¶ 13, submitted an MPOS, which indicated a net profit of $1,536 per month, AR 125, 130.  She also reduced her fee to the AAFES from thirty-seven percent to twenty-seven percent.  Id. at 125.  On December 11, 2008, T-Shirt House submitted its MPOS, which indicated a net profit of $2,587.50 per month, and revised its fee to the AAFES from 33.1 percent to 27.5 percent.  Id. at 168-69; cf. id. at 163 (containing a

December 15, 2008 electronic-mail communication from T-Shirt House submitting a revised fee to the AAFES of 27.25 percent).  Also on December 9, 2008, Ms. Dunbar contacted Victoria A. Roldan, the services business manager at Fort Benning, to confirm the accuracy of the $45,000 monthly gross sales estimate contained in the solicitation.  Id. at 149-50.  Ms. Dunbar apprised Ms. Roldan that offerors questioned the estimate, and "[i]f the sales were over inflated . . . , then it will make it very difficult for the offeror[s] to give a reasonable fee percentage."  Id. at 150.  Ms. Roldan confirmed that the sales estimate was not overinflated.  Id. at 149.

Thereafter, the AAFES deemed the revised proposals submitted by plaintiff and T-Shirt House to be both fair and reasonable.  Id. at 125.  T-Shirt House remained the highest fee offeror, and its 27.25 percent fee to the AAFES was 2.25 percentage points higher than its then-current contract with the AAFES and 0.25 percentage points higher than the fee contained in plaintiff's proposal.  Id. at 156.  On December 18, 2008, the AAFES awarded the contract to T-Shirt House because it provided the AAFES with the "best advantage in accordance with the competitive evaluation criteria set forth in the solicitation."  Id. at 179, 213-14.

### C.  Plaintiff's Protest

Plaintiff contends that her company was the only offeror that owned an Anajet Garment Printer, a heat transfer press and transfer machine that she asserts was required equipment under the solicitation.  Am. Compl. ¶¶ 12, 14-15.  According to plaintiff, Ms. Roldan informed her that she was required to own the heat transfer press and transfer machine in order to have her bid considered.  Id. ¶ 18.  Plaintiff, in reliance upon Ms. Roldan's oral statements, purchased the equipment, which cost in excess of $10,000.  Id. ¶ 19.  On December 22, 2008, plaintiff protested the AAFES award of the concessionaire contract to T-Shirt House.  Id. ¶ 16; AR 355, 359. According to plaintiff,

> [t]he contract stated you MUST have the equipment to make a t-shirt on the premises.  The T-Shirt House doesn't have the equipment on the premises and has not for the last five years . . . .  [H]ow did they answer the question about the equipment?  I HAVE THE EQUIPMENT.  My bid was the highest until you asked me to change my bid.  I feel like this was fixed from the beginning for the T-SHIRT HOUSE to be awarded the Contract.

AR 359.  Additionally, plaintiff alleged bias in the procurement process:

> The statement [related to owning an Anajet Garment Printer] was made by the person who has the sunglass stand at Fort Benning that VICK[Y] [Roldan] would take care of Jill [Pellegrini] at the T-Shirt House[,] and Angela and Jill at the sunglass stand [s]ocialize with VICK[Y] after hours.  Isn't this a conflict of interest?  You need to check into all of this.

Id.

In a written response dated December 30, 2008, Ms. Dunbar denied plaintiff's protest.  Id. at 355-56.  First, Ms. Dunbar indicated that all proposals were properly considered in accordance with applicable procurement procedures and solicitation criteria, explaining that the contract award to T-Shirt House "was based on the highest fee offered to [the] AAFES."[2]  Id. at 355. Second, Ms. Dunbar responded to plaintiff's claim concerning the on-site location of the equipment at issue by indicating that the solicitation "does not require the contractor to have the equipment on the premises as stated in your letter."  Id.   Third, Ms. Dunbar refuted plaintiff's contention that she was required to modify her proposal:

> I did not ask you to change your bid; I requested a best and final fee offer [from] all of the offerors.  In return[,] two offerors came back with what appeared to be unreasonably high fees, so I requested that each offeror fill out a[n MPOS] in order to see if the contractor could operate at such a high fee.  The offerors came back with a reasonable fee percentage based on the MPOS and the contract was awarded to the highest fee offeror.

Id.  Finally, Ms. Dunbar rejected plaintiff's allegations of bias:

> While either or both of [your] allegations may or may not be true, neither could or did impact the award decision.  Ms. Roldan had no influence over or input into the decision to award the contract; all such decisions are made by contracting officers at HQ AAFES [in Dallas, Texas] based upon the proposals submitted by the offerors.

Id.

## D.  Procedural History

Approximately seven months after Ms. Dunbar denied her protest, plaintiff filed a complaint in the United States Court of Federal Claims ("Court of Federal Claims").  Plaintiff requests, among other things, that the court set aside the contract award to T-Shirt House, require the AAFES to reevaluate her proposal, and direct the AAFES to award her the contract.  Am. Compl. Wherefore ¶¶ 1-2.  Following briefing, the court heard argument on defendant's motion to dismiss and plaintiff's motion to supplement.  In its November 30, 2010 decision, the court granted in part and denied in part defendant's motion to dismiss, concluding that it possesses jurisdiction over plaintiff's bid protest.  Thus, the court turns to plaintiff's motion to supplement the administrative record.

---

[2]  Ms. Dunbar explained that T-Shirt House "was determined eligible; [had] adequate financial resources . . . ; was able to comply with the required performance; has a record of satisfactory performance . . . [and] integrity; has the necessary organization, experience, and technical skills . . . ; and has the necessary technical equipment and facilities to perform the contract . . . ."  AR 356.

## II. DISCUSSION

According to plaintiff, supplementation of the administrative record is necessary in order "to adequately confirm the dates of the bids, to confirm or deny equipment, and to establish the detailed, unique features and benefits of the equipment required in the solicitation." Pl.'s Mot. Supplement Administrative R. ("Pl.'s Mot.") 2. With respect to the submission dates of the various revised proposals, plaintiff argues that she was asked to rebid and the record does not reflect the correct order in which the proposals were received by the AAFES. According to plaintiff, the "dates of these bids are extremely crucial, as it goes to the underlying heart of wrongfully influencing the bidding process by the contracting officer." Id. Thus, plaintiff seeks to supplement the record with an affidavit, together with postage receipts, that she believes would establish a proper time line of the offerors' submission of their various revised fee proposals. Resp. Def.'s Opp'n Supplement Administrative R. ("Pl.'s Reply") 5. Nevertheless, plaintiff did not append the proposed affidavits or copies of any postal receipts to her motion to supplement.

Plaintiff also argues that the administrative record does not confirm that T-Shirt House owned or had on the premises an Anajet Garment Printer, equipment that plaintiff asserts the awardee was required to own. According to plaintiff, the solicitation required that the awardee own specific garment printing equipment on the premises, and she claims that Ms. Roldan advised her that she must purchase the equipment. Plaintiff asserts that the "requirement of the equipment is key. Without the equipment, onsite, specialty designed t-shirts while the soldier waits is impossible." Pl.'s Mot. 4. As such, plaintiff argues that supplementation of the record with evidence that T-Shirt House did not have allegedly essential equipment would enable the court to "fully understand the arbitrary and capricious nature of the contract award," id. at 2, and demonstrate that T-Shirt House was ineligible to compete for the contract,[3] id. at 3; see also id. (noting that plaintiff purchased the equipment "prior to the bidding process to confirm . . . eligibility"). Plaintiff emphasizes that supplementation "will prove that . . . if the process had been adhered to fairly and in accordance with the published solicitation requirements and those of what Ms. Roldan told [her], that [she] would have been the successful bidder[] and awarded the contract." Pl.'s Reply 4; see also id. at 5 (asserting that T-Shirt House, by virtue of its apparent lack of the required equipment, must produce its items "off-site" in violation of the terms of the solicitation). Nevertheless, plaintiff did not append the proposed evidence to her motion to supplement.

Defendant characterizes plaintiff's motion as seeking the incorporation of materials that "support an unsubstantiated claim of bad faith by the contracting officer," despite the fact that plaintiff failed to allege bad faith conduct on the part of the contracting officer in her amended

---

[3] Specifically, plaintiff requests supplementation of the record with her own affidavit "regarding [t]he [T-]Shirt House not having the Anajet [Garment] Printer Treat Transfer Press and Transfer Machine, with specific size, weight[, and] manufacturer's specifications." Pl.'s Reply 5.

complaint.[4]  Def.'s Mot. Dismiss & Opp'n Pl.'s Mot. 5.  Notwithstanding plaintiff's failure to plead bad faith conduct on the part of the contracting officer, defendant asserts that plaintiff has pointed to no record evidence that rebuts the presumption that government officials act in good faith when discharging their duties.  On this basis, defendant argues that supplementation is inappropriate.

In addition to emphasizing plaintiff's failure to append any evidence to her motion to supplement, defendant maintains that plaintiff has not demonstrated how supplementation promotes effective judicial review.  According to defendant, nothing plaintiff has offered supports the notion that the record is incomplete.  Moreover, defendant asserts that whether T-Shirt House possessed certain equipment at the time it submitted its proposals is irrelevant because the solicitation required possession of equipment at the time of performance.  Defendant also objects to supplementation with an affidavit from plaintiff related to what equipment T-Shirt House allegedly owned or did not own because such evidence would constitute nothing more than plaintiff's self-serving statements based upon incomplete knowledge.  Finally, defendant argues that plaintiff's grievance related to what equipment T-Shirt House owned at the time of bidding falls under issues of contract administration that are not appropriately raised in a bid protest.

## A.  Standards for Determining Whether Supplementation Is Appropriate

The Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874-76, expanded the bid protest jurisdiction of the Court of Federal Claims.  Pursuant to the ADRA, the Court of Federal Claims reviews the legality of an agency's decision in accordance with the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2006).  See Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000); Asia Pac. Airlines v. United States, 68 Fed. Cl. 8, 19 (2005); see also 28 U.S.C. § 1491(b)(4) (2006) ("In any action under [section 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  "The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court."  Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).  "As a general rule, in determining whether an agency's actions are arbitrary or irrational, the 'focal point for judicial review [of the agency's decision] should be the administrative record already in existence, not some new record made initially with the reviewing court.'"  Knowledge Connections, Inc. v. United States, 79 Fed. Cl. 750, 759 (2007) (quoting Fla. Power & Light Co., 470 U.S. at 743 (alteration in original)).  The principle that a reviewing court "is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions," Fla. Power & Light Co., 470 U.S. at 744, "exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny," Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989), disapproved on other grounds by Axiom Res.

---

[4]  Plaintiff did not move, pursuant to RCFC 15(a)(2), for leave to file a second amended complaint to include any new allegations.

Mgmt., Inc. v. United States, 564 F.3d 1374, 1379-81 (Fed. Cir. 2009).

The administrative record "is not a documentary record maintained contemporaneously with the events or actions included in it.  Rather, it is a convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court." Tech Sys., Inc. v. United States, 50 Fed. Cl. 216, 222 (2001).  "[I]t must be remembered that the 'administrative record is a fiction.'" Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 508 (2003) (quoting CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 118 (2000)); see also PlanetSpace Inc. v. United States, 90 Fed. Cl. 1, 4 (2009) ("The conceptual elegance evinced by these fundamental principles of administrative law . . . masks the practical difficulty of identifying where the 'administrative record' ends and where 'extra-record' evidence begins.").  The court therefore eschews "apply[ing] an iron-clad rule automatically limiting its review to the administrative record." GraphicData, LLC v. United States, 37 Fed. Cl. 771, 779 (1997); accord id. at 780 ("[A] judge confronted with a bid protest case should not view the administrative record as [an] immutable boundary that defines the scope of the case."); Al Ghanim, 56 Fed. Cl. at 508 n.7 (recognizing that judges in the Court of Federal Claims will allow supplementation of the administrative record when appropriate); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 350 (1997) (stating within the bid protest context that "this court has adopted a flexible approach . . . in putting together the evidence that will be considered . . . , balancing the limited nature of the court's review with the competing need to recognize potential exceptions to treating the agency's submission as the four corners of the inquiry").  Nevertheless, supplementation of the administrative record is not automatic, and "the flexibility of the court's scope of review does not give the parties carte blanche to supplement the record . . . ." Al Ghanim, 56 Fed. Cl. at 508.

In Esch, a case frequently discussed and cited by the Court of Federal Claims, the United States Court of Appeals for the District of Columbia Circuit identified eight exceptions that justified supplementation of the administrative record.  876 F.2d at 991 (citing Steven Stark & Sarah Wald, The Failed Attempts to Limit the Record in Review of Administrative Action, 36 Admin. L. Rev. 333, 345 (1984)).  The United States Court of Appeals for the Federal Circuit ("Federal Circuit"), however, disapproved the practice of invoking the Esch exceptions in order to supplement the administrative record in Axiom Resource Management, Inc., 564 F.3d at 1380-81.  Reliance upon Esch, the Federal Circuit explained, was "problematic" for two reasons. Id. at 1380.  First, the exceptions articulated in Esch were derived from a law review article that predated the United States Supreme Court's decision in Florida Power & Light Co., which determined that a reviewing court must apply the appropriate APA standard to agency decisions based upon the record presented by the agency to the court. Id.  Second, "Esch's vitality even within the D.C. Circuit is questionable in light of more recent opinions by that court which demonstrate a more restrictive approach to extra-record evidence." Id. (citing IMS, P.C. v. Alvarez, 129 F.3d 618 (D.C. Cir. 1997); Saratoga Dev. Corp. v. United States, 21 F.3d 445 (D.C. Cir. 1994)).  "[I]nsofar as [it] departs from fundamental principles of administrative law as articulated by the Supreme Court," the Federal Circuit cautioned that Esch "is not the law of this circuit." Id. at 1381.

The Federal Circuit also emphasized in Axiom Resource Management, Inc. that "the parties' ability to supplement the administrative record is limited," id. at 1379, and that the "focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA," id. at 1381. Therefore, the Federal Circuit requires that courts determine whether supplementation of the administrative record is "necessary in order not 'to frustrate effective judicial review.'" Id. (quoting Camp v. Pitts, 411 U.S. 138, 142-43 (1973)). While several courts have indicated that motions to supplement are governed by Axiom Resource Management, Inc., see Pitney Bowes Gov't Solutions, Inc. v. United States, 93 Fed. Cl. 327, 331-32 (2010); Mont. Fish, Wildlife, & Parks Found., Inc. v. United States, 91 Fed. Cl. 434, 440 (2010), it remains unclear how the Federal Circuit's decision will be interpreted. For example, the court in Totolo/King v. United States determined that the "new guidelines" enunciated in Axiom Resource Management, Inc. merely "emphasize[d] restraint and adherence to precedent" and did not modify the court's practice of justifying supplementation of the record based upon several of the Esch exceptions. 87 Fed. Cl. 680, 693 n.7 (2009); see also Bannum, Inc. v. United States, 89 Fed. Cl. 184, 189 (2009) ("The Federal Circuit's recent decision in Axiom[] does not undermine the Court's rules for determining the content of the administrative record."). By contrast, the court in PlanetSpace, Inc. v. United States noted that "the continuing post-Axiom viability of any given Esch exception remains unclear." 90 Fed. Cl. 1, 8 (2009); cf. NEQ, LLC v. United States, 88 Fed. Cl. 38, 46 n.6 (2009) ("While Axiom undoubtedly permits limited supplementation of the record with evidence that does not involve the agency's procurement decision, . . . it makes clear that any court in this circuit that relies upon Esch to supplement the administrative record more broadly does so at peril of reversal.").

Ultimately, supplementation is justified when "required for meaningful judicial review," Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001); accord Murakami v. United States, 46 Fed. Cl. 731, 735 (2000) (noting that the Esch exceptions to the general rule against extra-record evidence "are based upon necessity, rather than convenience, and should be triggered only where the omission of extra-record evidence precludes effective judicial review" (emphasis added)), aff'd, 398 F.3d 1342 (Fed. Cir. 2005), or when "the record is insufficient for the Court to render a decision," Portfolio Disposition Mgmt. Group, LLC v. United States, 64 Fed. Cl. 1, 12 (2005); accord CCL Serv. Corp., 48 Fed. Cl. at 119 (stating that supplementation is appropriate where the record "still has lacunae that should be filled based on the protestor's challenges"). Supplementation is also justified "when it is necessary for a full and complete understanding of the issues." Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 494 (2006), aff'd, 492 F.3d 1308 (Fed. Cir. 2007); accord Al Ghanim, 56 Fed. Cl. at 508 (recognizing that supplementation is appropriate "when necessary to prove that evidence not in the record is evidence without which the court cannot fully understand the issues"); Mike Hooks, Inc. v. United States, 39 Fed. Cl. 147, 158 (1997) (considering evidence supplementing the record because it "help[s] explain the highly technical nature of the issues"). Although courts have employed a "flexible approach" to determine the corpus of evidence that will be considered in bid protest cases, Cubic Applications, Inc., 37 Fed. Cl. at 350, supplementation of the administrative record "'must be extremely limited,' lest the admission of

9

evidence not considered by the agency below and its consideration by the court convert the 'arbitrary and capricious' standard into effectively <u>de novo</u> review." <u>Murakami</u>, 46 Fed. Cl. at 735.

**B.  Plaintiff Has Not Demonstrated That Supplementation of the Administrative Record Is Warranted**

Although plaintiff contends that supplementation is "within the Court's latitude," Pl.'s Reply 6, and recognizes that the court must carefully weigh the propriety of supplementation, the court may only supplement the administrative record after first examining the agency-assembled record and then determining that its ability to adequately review agency action is constrained absent the consideration of extra-record evidence.  <u>See</u> <u>Axiom Res. Mgmt., Inc.</u>, 564 F.3d at 1380 (determining that the trial court's decision to supplement the record "without evaluating whether the record before the agency was sufficient to permit meaningful judicial review" constituted an abuse of discretion).  The court has carefully reviewed the agency-assembled administrative record filed in this case.  For the reasons explained below, it concludes that supplementation is not warranted.

**1.  Plaintiff Has Not Alleged That the Contracting Officer Exhibited Bias or Engaged in Bad Faith During the Procurement**

Allegations of bias or bad faith may, under certain circumstances, warrant supplementation of the administrative record because "rare indeed would be the occasions when evidence of bad faith will be placed in the administrative record, and to insist on this–and thus restrict discovery regarding bad faith to cases involving officials who are both sinister <u>and</u> stupid–makes little sense."  <u>Beta Analytics Int'l, Inc. v. United States</u>, 61 Fed. Cl. 223, 226 (2004).  In order "to address bias, the court will entertain extrarecord evidence and permit discovery when there has been a 'strong showing of bad faith or improper behavior' such that without discovery the administrative record cannot be trusted."  <u>Pitney Bowes Gov't Solutions, Inc.</u>, 93 Fed. Cl. at 332 (quoting <u>Ala. Aircraft Indus., Inc. v. United States</u>, 82 Fed. Cl. 757, 766 (2008)).  The Federal Circuit, however, has cautioned that "[a]n agency decision is entitled to a presumption of regularity.  '[D]iscovery of the contracting officer's reasoning is not lightly to be ordered and should not be ordered unless record evidence raises serious questions as to the rationality of the contracting officer's [decision].'"  <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003) (quoting <u>Impresa Construzioni Geom. Domenico Garufi</u>, 238 F.3d at 1341) (alterations in original).  Accordingly, a party seeking to obtain discovery based upon allegations of bad faith must (1) make a threshold showing of either a motivation for the government employee to have acted in bad faith or of conduct that is hard to explain absent bad faith, and (2) persuade the court that discovery could lead to evidence that would provide the level of proof sufficient to overcome the presumption of regularity and good faith.  <u>Beta Analytics Int'l, Inc.</u>, 61 Fed. Cl. at 226.  "Innuendo or suspicion is not enough to demonstrate bad faith and thus justify discovery."  <u>Id.</u> (citing <u>Orion Int'l Tech. v. United States</u>, 60 Fed. Cl. 338, 344 (2004)).

Here, although plaintiff intimates that Ms. Dunbar acted in bad faith and asserts that extra-record evidence is necessary to "air[] the cronyism and either blatant outright corruption or flagrant inability to follow [the AAFES's] own written solicitation," Pl.'s Reply 4, plaintiff's amended complaint is devoid of any allegation that Ms. Dunbar exhibited bias during the procurement process.  Instead, plaintiff's allegations focus upon Ms. Roldan, who allegedly "wrongfully influenced the bidding and contractual process," Am. Compl. ¶ 21, and engaged in "methods [of] procurement" that were both "arbitrary and capricious," id. ¶ 22.  Yet, plaintiff does not allege that Ms. Roldan was the contracting officer.  See id. ¶ 17 (alleging that Ms. Dunbar served as the contracting officer).  Accordingly, any issue related to Ms. Dunbar's purported acts of bad faith or bias is not before the court.  Meaningful judicial review is not advanced by supplementing the record with evidence that may support allegations that have not been pled.  Therefore, the court cannot supplement the administrative record with evidence of alleged bias or bad faith exhibited by Ms. Dunbar.

Alternatively, even assuming, arguendo, that plaintiff had, in fact, properly pled bias or bad faith by Ms. Dunbar, the court's determination is unchanged.  Plaintiff has not satisfied the two-part standard articulated by the Beta Analytics International, Inc. court.  Plaintiff also has not identified specific evidence in the record that raises questions concerning the rationality of Ms. Dunbar's decision to award the concessionaire contract to T-Shirt House.  See Info. Tech. & Applications Corp., 316 F.3d at 1323 n.2.  Instead, plaintiff merely asserts that an alleged conflict of interest involving Ms. Roldan tainted the procurement and precluded plaintiff from receiving the concessionaire contract.  However, the record contains Ms. Dunbar's written explanation for the AAFES's procurement decision and her determination that Ms. Roldan was not involved in the procurement process:

> While either or both of [your] allegations may or may not be true, neither could or did impact the award decision.  Ms. Roldan had no influence over or input into the decision to award the contract; all such decisions are made by contracting officers at HQ AAFES [in Dallas, Texas] based upon the proposals submitted by the offerors.

AR 355.  Where such an explanation has been furnished within an administrative record that appears complete, as is the case here, the party proffering extra-record material

> must indicate some personal animus or bias on the part of agency officials, reveal a latent inconsistency in the existing record, or otherwise give some indication that the agency's explanation is pretextual.  Absent this threshold showing, a plaintiff's bare allegations of bad faith are insufficient to place the issue or the proffered extra-record evidence before the court.

Madison Servs., Inc. v. United States, 92 Fed. Cl. 120, 130 (2010).  Plaintiff has not made such a showing and does not seek to supplement the record with any materials related to Ms. Dunbar's conduct that would overcome the presumption that she conducted the instant procurement with

regularity and in good faith.[5]

### 2. Supplementation of the Record Does Not Advance Meaningful Judicial Review

In addition, plaintiff has not demonstrated that supplementation of the administrative record is necessary to advance meaningful judicial review.  Although plaintiff believes that the "dates of the[] bids are extremely crucial, as [they] go[] to the underlying heart of wrongfully influencing the bidding process by the contract officer," Pl.'s Mot. 2, plaintiff has not alleged that Ms. Dunbar wrongfully influenced the procurement process.  Moreover, the chronology of events is already ascertainable within the agency-assembled record.  Specifically, the record indicates that plaintiff submitted her initial proposal to the AAFES on October 29, 2008, AR 123, and T-Shirt House submitted its initial proposal on November 5, 2008, id. at 156.  Plaintiff then submitted her "best and final offer" to the AAFES on November 21, 2008, id. at 137, while T-Shirt House submitted its "best and final offer" to the AAFES on November 22, 2008, id. at 172.  Finally, plaintiff submitted her MPOS, which included a fee to the AAFES of twenty-seven percent and net profits of $1,536, to the AAFES on December 9, 2008, id. at 125, 129-30; cf. Pl.'s Mot. 2 (asserting that the "actual submission date was December 10, 2008[,] by postal records"), and T-Shirt House submitted its MPOS, which included a fee to the AAFES of 27.25 percent and net profits of $2,587.50, on December 11, 2008, AR 168-69; cf. id. at 163 (containing a December 15, 2008 electronic-mail communication from T-Shirt House indicating its revised fee to the AAFES of 27.25 percent).  Because the record already provides sufficient information concerning the dates on which plaintiff and T-Shirt House submitted their various proposals, additional evidence, particularly in the form of plaintiff's own affidavit, is wholly unnecessary and does not aid the court in its review of agency action.

With respect to plaintiff's request to supplement the record with an affidavit "regarding [t]he [T-]Shirt House not having the Anajet [Garment] Printer Heat Transfer Press and Transfer machine, with specific size [and] weight manufacturer's specifications," Pl.'s Reply 5, such evidence does not advance meaningful judicial review.  Plaintiff's proposed affidavit would consist entirely of opinion testimony based upon what equipment she believes T-Shirt House possessed.  See id. (noting that plaintiff "is on the installation every day with her small kiosk and can testify to what she has seen").  Rule 701 of the Federal Rules of Evidence governs opinion testimony by lay witnesses:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue,

---

[5] Instead, plaintiff seeks to introduce extra-record evidence consisting of two affidavits, one containing the dates on which she submitted her proposals with postal receipts appended thereto, and a second indicating what equipment plaintiff believes T-Shirt House owned.  Pl.'s Reply 5.

and (c) not based on scientific, technical, or other specialized knowledge within
the scope of Rule 702.[6]

Fed. R. Evid. 701 (footnote added).  "[T]he law prefers that a witness testify to facts, based on
personal knowledge, rather than opinions inferred from such facts," 1 McCormick on Evidence
§ 10 (Kenneth S. Broun et al. eds., 2006), and Rule 701 only "authorizes the receipt of any lay
opinion 'helpful' to the trier of fact," id. § 11.

        In this case, plaintiff's proposed affidavit does not comport with the requirements of Rule
701 because it is not "helpful to . . . the determination of a fact in issue . . . ."  Fed. R. Evid. 701.
During oral argument, plaintiff's counsel acknowledged that ownership of the equipment at issue
was not a prerequisite to receiving the contract award, but counsel nevertheless asserted that the
solicitation required plaintiff to purchase a specific machine:

        THE COURT: Where in the administrative record does it indicate that owning
        this special ink jet transfer machine was a prerequisite for the award?

        COUNSEL: It doesn't say that per se.  It says in the bid solicitation that you have
        to have the machine, and [plaintiff] had a conversation with Vickie Roldan, who
        made it clear to her on numerous occasions that if she wanted to be considered
        that she needed to make sure that she had that equipment.

Hr'g Tr. 20:2-11.  Ultimately, the best evidence of what equipment was required under the
solicitation is Exhibit G, "Concessionaire Furnished Equipment," of the solicitation itself.  See
Fed. R. Evid. 1002 ("To prove the content of a writing . . . , the original writing . . . is required,
except as otherwise provided in these rules or by Act of Congress."); Bendix Corp. v. United
States, 600 F.2d 1364, 1371-72 (Ct. Cl. 1979) ("It is well settled, under the best evidence rule,
that in proving the contents of a document, the document itself must be produced . . . .").
Therefore, any extra-record evidence related to plaintiff's subjective interpretation of the terms
of–or requirements contained within–the solicitation and her opinion as to whether other offerors
possessed certain equipment does not assist the court in determining whether the AAFES acted

---

    [6] Rule 702 states:

        If scientific, technical, or other specialized knowledge will assist the trier of fact
        to understand the evidence or to determine a fact in issue, a witness qualified as an
        expert by knowledge, skill, experience, training, or education, may testify thereto
        in the form of an opinion or otherwise, if (1) the testimony is based upon
        sufficient facts or data, (2) the testimony is the product of reliable principles and
        methods, and (3) the witness has applied the principles and methods reliably to the
        facts of the case.

Fed. R. Evid. 702.

lawfully when it awarded the contract to T-Shirt House.

Furthermore, while plaintiff believes that her proposed extra-record evidence "allows a more thorough overview of the issues," Pl.'s Reply 6, supplementation for this purpose is not appropriate in this case.  "In general, the court will supplement the administrative record when it is necessary for a full and complete understanding of the issues."[7]  Blue & Gold Fleet, LP, 70 Fed. Cl. at 494.  Thus, the court in Mike Hooks, Inc. permitted supplementation of the record with, among other things, three affidavits that "help[ed] explain the highly technical nature of the issues" implicated in that case.  39 Fed. Cl. at 158; see also Idea Int'l, Inc. v. United States, 74 Fed. Cl. 129, 138 (2006) (justifying supplementation of the administrative record with declarations, in part, because of the complexity of the case, but limiting its consideration thereof to the propriety of injunctive relief).  Similarly, the court in Global Computer Enterprises, Inc. v. United States permitted supplementation, in part, due to the case's complexity, explaining that it required additional materials to understand the alleged existence of–and the protester's participation in–a niche industry that provided audit-supporting federal financial management services:

> The existence and nature of this alleged market would not necessarily be reflected within or encompassed by the agency-produced administrative record.  As a result, the court finds itself in a position in which it may not have a complete understanding of the issues before it . . . .  The court cannot make a reasoned decision without understanding the totality of the circumstances implicated in this case.

88 Fed. Cl. 52, 62 (2009); see also id. at 62 n.13 (noting that, while it "can extrapolate the potential existence of this market from portions of the administrative record," the court would gain "a fuller understanding" with the incorporation of extra-record evidence).

By contrast, the instant bid protest does not present any complex or technical issues that require supplementation in order for the court to fully understand the issues raised by the parties.  Although plaintiff emphasizes that she "is an honest, hard working woman" who conducts business in a manner such that "what you say is important and your word is sacred," Pl.'s Reply 4, plaintiff's work ethic and admirable business practices are not at issue.  The administrative record contains sufficient information for the court to understand the requirements of the solicitation and the chronology of proposals submitted by offerors to the AAFES.  Therefore, the incorporation into the administrative record of evidence related to (1) plaintiff's interpretation of the solicitation and opinion as to what equipment T-Shirt House owned, (2) submission dates of

---

[7]  After the Blue & Gold Fleet, LP court permitted supplementation of the administrative record, it observed that the extra-record evidence submitted "d[id] not clarify any matter that was or was not considered at the agency level" and did not aid in the court's review.  70 Fed. Cl. at 494.  Consequently, the court did not rely upon any of the supplemental materials.  Id.; accord id. n.9.

the offerors' proposals that are already ascertainable in the record, and (3) potential bias or bad faith on the part of the contracting officer that plaintiff did not plead in her amended complaint does not advance meaningful judicial review, and plaintiff does not cite any case law to the contrary.  Because the existing record permits the court to conduct a meaningful review of the AAFES's actions in a manner that is consistent with the applicable APA standard of review, see Axiom Res. Mgm't, Inc., 564 F.3d at 1381, plaintiff's motion to supplement must be denied.

## III.  CONCLUSION

For the reasons stated above, plaintiff's motion to supplement is **DENIED**.  The court has filed this decision under seal.  The parties shall confer to determine any proposed redactions. Then, the parties shall file under seal a joint status report indicating their agreement with the proposed redactions, together with a complete copy of the court's decision with all redactions clearly indicated, by no later than **Friday, December 17, 2010**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge